293 So.2d 871

**Larry Darnell COLE**

v.

**STATE.**

I Div. 451.

Court of Criminal Appeals of Alabama.

April 23, 1974.

Donald E. Brutkiewicz, Mobile, for appellant.

William J. Baxley, Atty. Gen., and Bernard F. Sykes, Asst. Atty. Gen., for the State.

**448**

HARRIS, Judge.

Appellant was convicted of robbery and his punishment fixed at imprisonment in the penitentiary for twenty (20) years. Appellant appeared at arraignment with retained counsel and pleaded not guilty. After conviction he was determined to be indigent, and he was furnished a free transcript. His trial counsel requested the court to appoint him to represent him on appeal and this was done.

The facts in this case are not in dispute, Around midnight on January 29, 1973, the Midget Drive-In located in Mobile, Alabama, was robbed by a lone gunman. At the time of the robbery, Charity Bell Lewis, the manager, was present along with Ruby Jane Rembert, daughter of the owner of the drive-in, and a customer by the name of Willie Wright, Jr. Appellant walked around in the place for a few minutes during which time the manager kept asking him if there was something he wanted. Appellant then pulled a pistol and told the manager this was a robbery and he wanted the money. She told him she did not have any money; whereupon, he went to the cash register and raised the bottom drawer. Under this drawer was some currency consisting of five-dollar

bills and one-dollar bills. Some of the one-dollar bills were *torn*. Appellant took all the currency and all the change, viz., quarters, dimes, nickels and pennies. He put the change in a sack and the currency in his pocket. He pointed the pistol directly at the manager and ordered her to go to the back. She raised her hands and walked to the back of the place. He told all three witnesses to lie on the floor and that if anyone came to the place to tell them they were closed for the night. They saw him walk out the front door and observed him get in a small red car occupied by three men. Appellant drove away.

The robbery was immediately reported to the Mobile Police Department with a description of the robber and information that he was driving a small red automobile. He was described as wearing blue jeans, a light brown-looking shirt and a long black coat and also as having on a black cap with a ball or bob on top. A police radio dispatch was made and seven to ten minutes later, an officer on patrol stopped a red Camaro automobile being driven by a man dressed precisely as described in the robbery report given by the victim. The driver got out of the car. The sequence of events leading up to the arrest was testified to by the officer as follows:

"Q. I will ask you this, if you had occasion on that night to see the Defendant, Larry Cole?

"A. Yes; I did.

"Q. All right; now where was he when you saw him?

"A. He was driving the vehicle that I had stopped.

"Q. What kind of automobile was that?

"A. It was a red Camero. I don't recall the year.

"Q. All right, sir; and how many—was he by himself or was anyone with him or what?

"A. There were three other people with him.

"Q. All right; now I'll ask, if you will, to tell this Jury just what, if anythong, occurred when you stopped the Camero.

"A. As I stopped the Camero, they pulled over to the side. The driver got out of the car . . .

"Q. Is the driver the Defendant?

"A. Right.

"Q. All right; go ahead.

"A. He was dressed in jeans, had a three-quarter length black coat on, had that black cap there on.

"Q. When you refer to the black cap there, are you referring to State's Exhibit 2 for identification?

"A. Yes; I am.

"Q. Go ahead.

"A. I called radio and advised I had stopped a car fitting the description with the description of the subjects in the car. The Defendant approached the car. I asked him to stop between his car and mine. I was standing at the edge of the scout car, and the other defendants—the other people got out of the car and started to walk off from the car. I advised them to stop. They stopped. I asked them to walk back toward me. They did so, got between my car and their car and they stopped. The Defendant turned and walked back to the Camero, stooped over, put his hand in his pocket—coat pocket. I advised him to straighten up and turn around and face me. As he straightened up, I heard what appeared to be a shot and saw the Defendant fall to the ground, wounded.

"Q. Now did you fire this shot?

"A. No, sir.

"Q. Do you know where the shot came from?

"A. I did ascertain it; yes, sir.

"Q. Where was that?

"A. He had fired the shot. The gun was hung in the coat lining of his pocket. It fired as he was bringing it out.

"Q. All right, sir; and what, if anything, happened then?

"A. I made all the men lie on the ground, went around them, gave the Defendant a fast frisk, found the revolver in the coat lining of his pocket.

"Q. All right; now I want to show you what has been marked as State's Exhibit 3 for identification, and I will ask if you can identify this gun?

"(Whereupon, witness examined State's Exhibit 3 for identification.)

"A. Yes; I can.

"Q. What is that gun, please, sir?

"A. It's a .22 H&R revolver.

"THE COURT: Hold it just a minute. Officer, check it again to make sure it is not loaded.

"(Whereupon, the officer complied.)

"Q. You found that gun; it had been fired?

"A. Yes, sir.

"Q. All right; were there any other live rounds in the gun?

"A. Yes; it was.

"Q. All right; what, if anything, else did you find when you frisked the Defendant?

"A. I found some one-dollar bills on him in his coat pocket. Some of them was torn.

"Q. All right, sir; I am going to show you what has been marked as State's Exhibit 1 for identification. I will ask if you can identify those bills?

"(Whereupon, witness examined State's Exhibit 1 for identification.)

"A. Yes, sir.

"Q. What are those bills?

"A. That's the torn bills that I got out of his pocket that was in his pocket.

"MR. HOLLOWAY: Your Honor, at this time, I would offer State's Exhibit 1 for identification into evidence.

"MR. BRUTKIEWICZ: I've seen them already, Your Honor.

"THE COURT: Is there objection?

"MR. BRUTKIEWICZ: No, sir.

"THE COURT: Allow them in evidence and have them marked as State's Exhibit 1."

In searching the automobile the officer found a brown paper bag containing quarters, dimes, nickels and pennies in the front part of the Camaro and paper bills were found on the back and front floorboards. The victim identified the torn one-dollar bills as those taken during the robbery and also identified the cap as the one worn by the robber. These exhibits were admitted in evidence without objections. Also, the pistol taken out of appellant's coat pocket after he shot himself was admitted in evidence without objection.

After appellant's arrest, he was carried to a local hospital for examination and treatment. Following this, he was placed in jail with the other three arrestees and charged with robbery.

The state pitched the prosecution on the in-court positive identification of appellant as the robber by the three eye witnesses to the crime. According to their testimony the Midget Drive-In was a well-lighted place and they observed the robber face-to-face from three to five minutes and from a distance of two to seven feet. All of them withstood a vigorous and thorough cross-examination on the identity issue.

It was developed during cross-examination that some two hours after the four men were arrested the police conducted a line-up. Each of the three witnesses viewed the line-up separately. In each line-up the men were required to shift or change positions before another viewer was permitted to take a look. All three state witnesses picked out appellant as the lone gunman who robbed the Midge Drive-In.

When appellant was advised that he was going to be placed in a line-up, he was told that he was entitled to have his attorney present and that if he did not have an attorney and wanted one, the court would appoint a lawyer for him. Appellant told the officers that he did not want an attorney appointed by the court but wanted an attorney of his own choosing. He wanted Mr. Donald E. Brutkiewicz. He was permitted to use the telephone to call his attorney but was not able to make contact with him. Appellant was then allowed to call his mother to solicit her help in contacting the attorney of his choice and she told him she did not think she could contact a lawyer at that early morning hour. The mother finally reached Mr. Brutkiewicz at ten o'clock in the morning. The line-up took place around three o'clock a. m. on the same date.

The officers prepared and presented to appellant a waiver of rights to an attorney being present at the line-up. This was presented to him at 2:05 A.M. and he refused to sign the form. The officers waited until 3:15 A.M. before the first line-up was conducted. They delayed the first line-up an hour and ten minutes waiting on appellant to contact his attorney. When it became obvious that he was not going to be able to contact his attorney, the line-ups began.

Often times in their zeal to ferret out crime and bring an accused to the bar of justice, some officers become over-zealous and too hasty. Under the facts in this case, there was absolutely no necessity for

a line-up that entails due process problems and constitutional questions. The eye witnesses had given the officers a vivid description of the manner in which appellant was dressed and the type and color of the car he was driving. He was stopped in less than ten minutes after the crime was reported. If the officers felt that a further identification was necessary, they should have carried appellant by the Midget Drive-In and presented him to the victim and the two other witnesses. This procedure would have squared with due process of law.

 It is now settled law that prompt on-the-scene confrontation is "consistent with good police work", and does not offend the principles established in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178; Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199; Biggers v. Tennessee, 390 U.S. 404, 88 S.Ct. 979, 19 L.Ed.2d 1267; Cornelius v. State, 49 Ala. App. 417, 272 So.2d 623.

"In Bates v. United States, 132 U.S. App.D.C. 36, 405 F.2d 1104, Judge Burger, now Chief Justice of the Supreme Court of the United States, writing for the court said:

" 'There is no prohibition against a viewing of the suspect alone in what is called a "one-man showup" when this occurs near the time of the alleged criminal act; such a course does not tend to bring about misidentification but rather tends under some circumstances to insure accuracy.'

"In Bates, Judge Burger further wrote:

" 'Our review of the circumstances surrounding the apprehension of Appellant and the police conduct which led to his identification satisfies us that the claim that Appellant was denied due process of law is without merit; there was no "substantial likelihood of irreparable misidentification." To the contrary, the police action in returning the suspect to the vicinity of the crime for immediate identification in circumstances such as these fosters the desirable objectives of fresh, accurate identification which in some instances may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail if fresh. * * *'

"The confrontation in this case occurred less than thirty (30) minutes after the robbery.

"In United States ex rel. Cummings v. Zelker, 455 F.2d 714, the Court of Appeals for the Second Circuit said:

" 'The confrontation in this case was a reasonable one. When the two suspects were brought to Mrs. Camardella's house, only 30 minutes had elapsed since she reported the crime. It must have been obvious to the witness that the suspects were apprehended solely on the basis of the descriptions given by her to the police. Thus this prompt confrontation was desirable because it served to insure "the immediate release of an innocent suspect and at the same time [to] enable the police to resume the search for the fleeing culprit while the trail is fresh." Bates v. United States, 132 U.S.App.D.C. 36, 405 F.2d 1104, 1106 (1968). We view the instant situation as one in which prudent police work necessitated the on-the-spot identification in order to resolve any possible doubts the police may have had when they first took the petitioner into custody.'

"See also United States v. Sanchez, 2 Cir., 422 F.2d 1198.

"Mr. Justice Douglas, although dissenting to the affirmance of a state court conviction in Biggers v. Tennessee, supra, readily conceded:

" 'Of course, due process is not always violated when the police fail to assemble

a lineup but conduct a one-man show-up.' "

■ All the state's witnesses testified that they got a good look at appellant during the robbery in a well-lighted drive-in. They were all close to him and stated that they could have identified him even if they had not seen him in the line-up and that actually the line-up was no help to them in making the identification. All witnesses described the robber as being dressed in jeans, coat and cap, exactly like appellant was wearing at the time of his arrest some seven to eight minutes after the robbery. No witness identified any other person at any time. None of the witnesses were shown any photographs for identification purposes. The line-up was the first opportunity any of the witnesses had to see appellant after the robbery and that took place something over two hours after the crime was committed.

The in-court identification was not tainted by the prior line-up. In fact the prior line-up served no useful purpose to these witnesses in the identifying process. Robinson v. State, 45 Ala.App. 236, 228 So.2d 850.

In Ratcliff v. State, 49 Ala.App. 77, 268 So.2d 858, this court, relying on Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L. Ed.2d 411, held that a defendant did not have a constitutional right to be represented by counsel at a line-up occurring on the night of his apprehension but before he had been indicted or formally charged with a crime. These cases serve to dispose of that issue in this cause.

Appellant complains that he was denied his constitutional right to a speedy trial in this case. Testimony was taken on this issue and the record reflects that he was arrested shortly after midnight on January 29, 1973. He had a preliminary trial on February 5, 1973, and was bound over to the grand jury. He was indicted on April 6, 1973, and arraigned on April 11, 1973, at which time his case was set for trial on September 10, 1973. At arraignment he filed a motion for a sanity hearing which motion was granted, and he was transferred to a state hospital for examination. He was found to be sane and was returned to jail two weeks later. On June 20, 1973, he filed a motion to dismiss the indictment and to discharge him because he had been denied a speedy trial and bond was reduced from $10,000 to $5,000. This motion was overruled on June 22, 1973. The motion to dismiss was renewed on the day of the trial, September 10, 1973, and denied.

■ In Mobile County jury trials in criminal cases are not ordinarily held in July and August. Appellant's case, according to the trial judge, was set on the very first day of jury trials on the September docket. It thus appears that the time from arraignment, April 11, to time of trial, September 10, 1973, is five months. Two weeks of this time was spent in a state hospital undergoing a sanity examination at his request. From the date of his arrest to the date of trial was eight months. A preliminary hearing was given him at his request five days after he was arrested.

■ There has been no unreasonable delay on the part of the state in bringing appellant to trial. It is settled law that speedy trial rights to not operate to deprive the sate of a reasonable opportunity to prosecute defendants. A defendant cannot claim his constitutional rights have been denied where the delay is caused by him, or where delays are made necessary by the law itself, or occasioned by want of time to try the case. Sample v. State, 138 Ala. 259, 36 So. 367; Braden v. State, 49 Ala.App. 97, 268 So.2d 877.

In Sellers v. State, 48 Ala.App. 178, 263 So.2d 156, we said:

"In addition to showing a demand for speedy trial, to make a prima facie case for release an accused normally must

also show that actual prejudice resulted from the fact that trial was delayed. Hoskins v. Wainwright, 440 F.2d 69 (5th Cir., 1971); United States v. King, 431 F.2d 734 (5th Cir., 1970); United States v. Fitzpatrick, 437 F.2d 19 (2d Cir., 1970), cf. Dickey v. Florida, supra [398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26]. According to Hoskins, supra, if the accused relies on passage of time alone to establish prejudice, he can meet this burden by showing (1) that prosecution was delayed beyond the point at which a probability of prejudice arose; (2) that he himself was not responsible for the delay; and (3) that the state ought reasonably to have avoided the delay."

There was no error in the denial of the motion to dismiss the indictment.

We have carefully searched the record for errors injuriously affecting the substantial rights of the accused and have found none. The case is due to be, and is hereby affirmed.

Affirmed.

All the Judges concur.