301 So.2d 238

**Daniel Patrick McHUGH**

**v.**

**STATE.**

**6 Div. 732.**

Court of Criminal Appeals of Alabama.

Oct. 1, 1974.

Clifford W. Hardy, Jr., Bessemer, for appellant.

William J. Baxley, Atty. Gen., and Rosa G. Hamlett, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was convicted of murder in the first degree and sentenced to life imprisonment in the penitentiary. Prior to arraignment he was found to be indigent and counsel was appointed to represent him. His pleas were not guilty and not guilty by reason of insanity. He was furnished a free transcript of the evidence and new counsel was appointed to represent him on appeal.

The record before us reflects one of the most heinous crimes in the annals of criminal jurisprudence. It is certainly one of the most brutal and senseless murders to find its way into the permanent archives of this Court.

On the night of February 17, 1973, McHugh, age 22, killed his girlfriend, Debra Louise Cowan, age 18. He beat her on the head and face with his fist in the backseat of his automobile while parked on a road in an isolated wooded area in the Bessemer Division of Jefferson County. He choked and strangled her rendering her in a semiconscious state. He removed all of her clothes and had sexual intercourse with her. She was bleeding from her mouth and he got blood on his hands. He then decided he had to kill her. He drove aimlessly around with her moaning and groaning in the backseat. He stopped at a chapel and took a rope he had in the car and tied her hands behind her back and tied her feet together. He covered her nude body with her plaid coat and his coat and started driving again. He was looking for a secluded place to dump her body. He drove in the area of the New Bessemer Airport. He turned off the main road onto an old logging road. The wheels of his car started spinning and he could not make the top of a hill. He got out of the car and picked up Debra and carried her up the hill and placed her on the ground near a pine tree. He went back to the car and got their coats and returned to the pine tree. He removed the rope from Debra's feet and wrapped one end around the tree and he twisted the other end around her neck. He choked her with his hands and then took the rope and garroted her until she stopped breathing. He decided to take her body back to his car and dump her over a viaduct near Ensley. He started dragging her body down the hill but got tired and abandoned her to the elements and wild creatures of the forest.

The next day between one and two o'clock p. m. he was parked at a dining place in Midfield. He was debating with himself whether to abscond or surrender to

the authorities and admit his crime. He decided to give up and drove to the Police Department in Midfield. He walked in and told a police dispatcher that he had killed someone and wanted to turn himself in. Other police officers were summoned and appellant was given the *Miranda* warnings. He told the officers he understood his rights and did not want a lawyer. He signed the following waiver of rights form:

"STATE EXHIBIT 13

VOLUNTARY STATEMENT

DATE Feb. 18, 1973     PLACE Midfield Police Dept.

TIME STARTED  2:55 P.M.

"I, Daniel Patrick McHugh, am 22 years old. My date of birth is March 11, 1950. I live at 522 Oak Place, Fairfield, Ala. The person to whom I give the following voluntary statement, Sgt. J. E. Gay having identified and made himself known as a Police Detective—G'ham Police Dept.

"DULY WARNED AND ADVISED ME, AND I KNOW:

"1. That I have the right to remain silent and not make any statement at all, nor incriminate myself in any manner whatsoever.

"2. That anything I say can and will be used against me in a court or courts of law for the offense or offenses concerning which this statement is herein made.

"3. That I can hire a lawyer of my own choice to be present and advise me before and during this statement.

"4. That if I am unable to hire a lawyer I can request and receive appointment of a lawyer by the proper authority, without cost or charge to me, to be present and advise me before and during this statement.

"5. That I can refuse to answer any questions or stop giving this statement any time I want to.

"6. That no law enforcement officer can prompt me what to say in this statement, nor write it out for me unless I choose for him to do so.

"A. No one denied me any of my rights, threatened or mistreated me, either by word or act, to force me to make known the facts in this statement. No one gave, offered or promised me anything whatsoever to make known the facts in this statement, which I give voluntarily of my own free will and accord.

"B. I do not want to talk to a lawyer before or during the time I give the following true facts, and I knowingly and purposely waive my right to the advice and presence of a lawyer before and during this statement.

"C. I certify that no attempt was made by any law enforcement officer to prompt me what to say, nor was I refused any request that the statement be stopped, nor at anytime during this statement did I request for the presence or advice of a lawyer. I have read each page of this statement consisting of —— pages, each page of which bears my signature, and corrections, if any, bear my initials, and I certify that the facts contained herein are true and correct.

"This statement was completed at —— ——.M. on the 18 day of Feb. 1973.

"WITNESS: Sgt. W. H. Sanders

"WITNESS: Det. A. J. Cornelius

"Daniel P. McHugh
 Signature of person giving voluntary statement."

He led the officers to the place where he left Debra's body. When they reached the body appellant put his arms over his forehead and said, "Oh no", and started crying. This was the first and only sign of remorse. More officers were called and also the coroner. Numerous photographs were taken of the nude body and the murder scene. The coroner carried the body to a funeral home for a more definitive examination.

More photographs were made. In conducting a pelvic examination, the coroner found semen in the vaginal canal. In the opinion of the coroner, death was due to strangulation.

Later that night a detective interviewed appellant after first giving him the *Miranda* warnings and he voluntarily signed the following confession:

"STATE EXHIBIT 19

"February 18, 1973
9:52 P.M.
Jefferson County Jail Bessemer

"I, Daniel McHugh, 522 Oak Place, Fairfield, have been advised of my constitutional rights, and I understand them. Sergeant Lawley advised me of these rights, and I have told him that I am willing to waive them and talk to him.

"I have known Debbie Cowan, who lived in Ensley Highlands and attended Ensley High School, since about 1969. We have been dating regularly for about four years.

"I went to her house on February 10th about 7:00 P.M., and there was some guy there. We didn't go out that night. I picked her up at her house at 7:00 P.M., February 17, 1973, and we went to the liquor store in Midfield, but it was closed. We drove to Fairfield, and I bought a pint of vodka. We went to McDonalds in Ensley and bought some cokes to mix with the vodka. I had been drinking most of the day. While we were at McDonalds, we started arguing about the guy who had been over at her house the week before. She said he was her cousin, but I could tell by the way she and her family acted that he wasn't her cousin.

"Q. Do you think this was the cause of what happened, your jealousy?

"A. Well, that and being deceived, an ego trip, you know.

"We drove around quite a bit, but I drove down in Shannon to a wooded area, and we started fighting. She was being critical of some older friends of mine who were living together but are not married. She was yelling and talking with a sneer, so I just let her have it!

"Q. How many times did you hit her before you knocked her out?

"A. Three (3) or four (4) times I guess, my mind just went blank and I kept hitting her.

"Q. You mean after she was unconscious?

"A. Yeah.

"Q. Had you had sexual relations with her at this point?

"A. We had started, she had her bra off. I stayed there for awhile; I was scared; then I left to go to Micky McClains house. (sic)

"Q. Was she in the front seat then?

"A. No, we were in the back seat when this happened. I drove to the McDonald Chapel and Edgewater area looking for Micky's house, but I couldn't find it.

"Q. Why did you go to his house; were you expecting him to help you?

"A. I don't know, it just came to my mind—Micky and I started driving. I got lost looking for his house and when I realized where I was at, I was down there at Cherokee Beach.

"I stopped in the McDonald Chapel area and tied her hands and feet with some rope that was on the floor of the car.

I covered her with my coat and her coat.

"Q. Was she nude at that time?

"A. Yes.

"Q. Was she alive at that time?

"A. Yes.

"Q. Where had you removed her clothes?

"A. In Shannon near where we had been parked.

"Q. Why did you remove her clothes?

"A. Well, I knew I had to get rid of her, so I planned to take her back on my side of town and dump her on the side of the road and tell everyone that I had left her at McDonalds. I was going to put the body near the viaduct in Ensley.

"During the period I was driving around lost; I saw a paved road with a chain link fence across it and a revolving beacon on my left. I think the colors were white, green and red. I turned around there and turned on a dirt road about two (2) or three (3) blocks from this gate. I started spinning and couldn't make the hill. I parked the car and took Debbie out and carried her to the top of the hill to a tree, a pine I think; I am not sure. I left her there and went back to get our coats.

"When I came back, she started bleeding. I guess I paniced (sic) then; that was when I knew I had to kill her. I had the blood on my hands, and it was on her face and the upper part of her body.

"I choked her with my hands and then with the rope.

"Q. Where did the rope come from?

"A. I took it from her feet. After I realized what I had done, I wanted to take her back.

"Q. Back where?

"A. I don't know, back to the car I guess. I started dragging her, but I got tired or something; I just said no, and I left her.

"Q. (Indicating marks on back of left hand) Is that where she scratched you?

"A. No, sir, that is where she bit me.

"Q. What did you do with her clothes?

"A. I threw them away, one at a time, going to Mickey's house. I threw the purse first (describes area near railroad tracks on Wilson Road in Wenonah). I turned left in front of the Soul College and threw the other things away, scattered to the other side of Fairfield.

"Q. You mentioned earlier going to sleep; when and where was this?

"A. I was on the road that goes from highway 150 to Shannon and I found myself weaving. I pulled off and slept until day break.

"Q. What kind of car were you driving?

"A. 1962 or 63 Chevrolet, red. It is my brother's car.

"Q. What is his name?

"A. Marty McHugh.

"Q. Do you know Bena Alesce; a friend of Debbie's?

"A. No, unless she was the girl who came by the house about 1:00 P.M. today asking about Debbie. I told her I let her out at McDonalds. She said Debbie was supposed to have spent the night with her last night.

"Q. Was anyone with her?

"A. Yeah, some other girl. I got dressed and drove down to Shoneys in Midfield; I sat there awhile trying to decide if I should run or admit what I had done. I decided to go to the Midfield Police and admit it and that is what I did.

"Q. Do you know anything about Debbie's billfold being found at Baker School?

"A. Yes, sir, I threw it there on the way home to Mac's Sunday morning. Chapel. 2/20/73 David P. McHugh

"Q. Was it red?

"A. Yes, it was.

"Q. What about any other items?

"A. I think I dropped the bra in front of the high school. Most of them, I can't remember.

"Q. Is there anything that should be included in this statement that is not included?

"A. No, nothing to speak of.

"Q. Is there anything that is wrong or should be changed?

"A. No sir, that is the way it is.

"I have read this statement which consists of six (6) pages, and Sergeant Lawley has read it to me. It is true and accurate to the best of my knowledge.

"s/David P. McHugh
2/20/73"

The trial judge ordered appellant transferred to Bryce Hospital for a psychiatric examination and evaluation on April 10, 1973. He remained at Bryce's until the early part of February, 1974. The Medical Director wrote a letter to the judge stating, in part:

"After a period of examination, observation, and study, it is the opinion of the hospital staff that the said Daniel Patrick McHugh is presently sane and competent. He, seemingly, was under the influence of drugs at the time of his charges, and we cannot say as to his competency at that time, although we have seen no evidence of psychosis since his admission to the hospital. We saw some depressive elements when he first came in the hospital, but we see no evidence of depression now."

Pursuant to the provisions of Title 45, Section 226, Code of Alabama 1940, the deposition of one of the staff psychiatrists at Bryce Hospital was taken and admitted in evidence.

Dr. James C. Thompson was a member of the team of psychiatrists who saw, inter-

viewed, and observed appellant during his stay in Bryce. According to his deposition appellant was unfriendly, sullen, seldom listened to the examiner, claimed to have no feelings regarding the death of his girlfriend, and says that this world is in a mess anyway.

In sum, it was Dr. Thompson's opinion that appellant has an explosive personality and his depression was a reactive one due to the charges pending against him, and at no time did he exhibit any signs of being psychotic. It was further his opinion that appellant had a clear understanding of the charges against him and that he could actively participate with his lawyer in his defense.

This was the only evidence offered in support of the special plea of not guilty by reason of insanity. This falls far short of insanity under Parsons v. State, 81 Ala. 577, 2 So. 854, and all other cases subsequently dealing with this subject.

Photographs of the scene of the homicide were admitted in evidence without objection.

Over appellant's objections, the state was allowed to introduce in evidence four (4) photographs of the nude body of the victim showing the rope twisted around her neck and the injuries over her body. One of the photographs illustrated how her hands were tied behind her back and over her buttocks. These photographs are most unpleasant and, as a matter of fact, are gruesome and ghastly. Even so, this was brought about by appellant's own deeds in the treatment of the deceased. Gruesomeness is no ground for excluding such photographs. McKee v. State, 33 Ala.App. 171, 31 So.2d 656; Palmore v. State, 283 Ala. 501, 218 So.2d 830; Boulden v. State, 278 Ala. 437, 179 So.2d 20; Middleton v. State, 47 Ala. App. 130, 251 So.2d 627.

The fact that such photographs are merely cumulative of detailed oral testimony does not affect their admissibility. Stallings v. State, 249 Ala. 1, 32 So.2d 233.

There was no motion to exclude the state's evidence; no request for the affirmative charge; no motion for a new trial, and no exceptions reserved to the oral charge of the court. There were no unfavorable rulings by the trial court that require a reversal. In this posture of the record nothing is presented for review. Eady v. State, 48 Ala.App. 726, 267 So.2d 516.

Affirmed.

ALMON, TYSON and DeCARLO, JJ, concur.

CATES, P. J., not sitting.