323 So.2d 412

**Robert George KIRCHEIS**

v.

**STATE.**

**1 Div. 594.**

Court of Criminal Appeals of Alabama.

Oct. 1, 1975.

Rehearing Denied Oct. 21, 1975.

D. Wayne Childress, Mobile, for appellant.

HARRIS, Judge.

Appellant was convicted of murder in the first degree involving the death of his wife and was sentenced to life imprisonment in the penitentiary. He was represented by court-appointed counsel at arraignment and throughout the trial proceedings. He pleaded not guilty. After sentence was imposed, he gave notice of appeal and was furnished a free transcript. Trial counsel was appointed to represent him on appeal.

Omitting the formal parts the two-count indictment upon which appellant was tried reads as follows:

"The GRAND JURY of said County charge, that, before the finding of this indictment ROBERT GEORGE KIRCHEIS whose name is to the Grand Jury otherwise unknown than as stated, unlawfully and with malice aforethought killed Evelyn Norton Kircheis, by striking her with a hammer, against the peace and dignity of the State of Alabama.

The GRAND JURY of said County further charge, that, before the finding of this indictment ROBERT GEORGE KIRCHEIS whose name is to the Grand Jury otherwise unknown than as stated, unlawfully and with malice aforethought killed Evelyn Norton Kircheis, by striking her with a blunt instrument, a more particular description of which is to the Grand Jury otherwise unknown, against the peace and dignity of the State of Alabama. CHARLES R. BUTLER, JR., District Attorney for the 13th Judicial Circuit of Alabama (County of Mobile)"

The testimony adduced by the state made out one of the most brutal, heinous, merciless and senseless killings imaginable. A defenseless woman was bludgeoned to death by a claw hammer or blunt instrument while in her own bed dressed in a night gown.

Mr. Michael Cook testified that he was employed by the Cypress Creek Country Club which was formerly the Riviere du Chien Country Club; that he knew appellant as he was formerly employed as comptroller at the club. He identified appellant by pointing to him in the courtroom. He further testified that he knew appellant's voice. He stated that on Saturday night, April 13, 1974, he received a telephone call from his employer, Mr. Jack Maloney, and as a result of his telephone conversation he went to apartment 202 of the Skyline Apartments and knocked on the door. Appellant and his wife lived in this apartment. He did not receive an answer in response to his knock on the apartment door. He then went to the apartment manager and asked her to please open the door because he was concerned that Mrs. Kircheis was ill. The manager let him in the apartment and he called Mrs. Kircheis and received no answer. The time was about 8:00 p. m. The lights in the apartment were out and he turned on the lights in the dining room and he saw no one around. He walked back to a bedroom. The light from the dining room shone clearly in the bedroom. The bed was rumpled and he lifted the cover and recognized the body of Mrs. Kircheis. He went downstairs and told the manager not to let anyone in that apartment and he called the Mobile Police Department. He went back upstairs and stayed at the front door of the apartment until the police arrived. Subsequently he gave the Police Department a written statement and he talked to no one except the police officers.

Mr. Ronald S. Myers was employed by the Mobile Police Department as an evidence technician and in this capacity he was on call twenty-four hours a day. He was at home on April 13, 1974, and received a call at approximately 9:05 p. m. to go to the apartment of appellant at 1164, apartment 202, Skyline Arms. He arrived at this apartment at 9:12 p. m. He carried his camera with him. He was met at the apartment by Sergeant Eugene Ganoe. Upon entering the apartment he and Ganoe walked down a small hallway to a bedroom where he saw a woman in bed. He took a series of pictures of the woman in bed and different scenes of the bedroom and of the entire apartment, and he drew a plan of the apartment. He drew a sketch of the floor plan on the blackboard before the jury and related the sketch to some 16 photographs he made at the scene.

Dr. Earl B. Wert, the Coroner of Mobile County, and a duly qualified pathologist, performed an autopsy on the body of Evelyn Kircheis on April 15, 1974, in the presence of Mr. Nelson Grubbs, Assistant State Toxicologist in charge of the Mobile Division.

From the record:

"Q All right, sir. And could you tell us what you found as a result of your autopsy?

A We found multiple blunt and sharp wounds of the head, neck, face, and back of the head, numbering nineteen, the most severe of which was at the angle of the left jaw penetrating down to involve the skull.

Q Doctor, could you point these out on me if you are able to so that the jury can fully understand? Or on yourself?

A Well, on myself. At this position here at the base of the skull, fracturing the skull and temple and the jaw with attachments to the skull. These wounds measured approximately two inches deep and about an inch wide. In addition, there were other fractures of the mandible, the lower jawbone; and a wound to the back of the head; and two parallel

pressure wounds in the front of the forehead between the eyebrows which suggested the track of a claw hammer might have made such wounds; the extensive hemorrhaging to the brain and fracture of the skull, but no other wounds internally, on her back, or extremeties. Death was attributed to blunt instrument wounds of the head with hemorrhage and fractured skull and damage to the brain."

Dr. Wert further testified that the wounds weren't such as might have produced immediate death. He could not pinpoint the time of death but stated the date could not have been prior to April 13, 1974, and that rigor mortis was present at the time he performed the autopsy. A series of photographs were made by a police officer during the autopsy.

One of the investigating officers described the murder scene as follows:

"WITNESS: Well, when I went in the bedroom, the first thing I noticed was the condition of the body. The body was covered with a sheet. The sheet was removed, and I observed the body, and the body was very bloody. The body had bruise marks all over it. The head appeared to have been—the skull was punctured. There was matted blood all in the hair of the body. The sheets and bed clothing were soaked with blood, and there was blood splattered all over the ceiling, walls, floor, closets."

A claw hammer was found in a tool box in the back corner of a closet next to the living room which was a good distance from the bedroom where the body of the woman was found. The tool box was obscured by a long evening gown. The gown was removed so that a photograph could be made of the hammer in the tool box. The underside of the claw appeared to be bloodstained.

In the course of the investigation the officers learned that the deceased owned a

Plymouth Duster, bearing a Florida license tag, and the color of the car was white over red. The car was missing and appellant could not be found in the Mobile area. A radio dispatch was put out for appellant and the missing automobile.

Mrs. Ann Tallman testified that on April 12, 1974, she lived in an apartment at the Skyline Arms Apartments and that appellant and his wife lived in the apartment above hers. She stated that on that Friday morning, April 12, 1974, she got up as usual and dripped her a cup of coffee. That the Kircheis' master bedroom was right above her master bedroom. She said after drinking her coffee, she was preparing to take a shower when she heard a scream. She listened for a few minutes in silence and heard nothing else for a few minutes and then she heard some sobbing —kind of hysterical like crying and sobbing and then she heard nothing else.

Mrs. Tallman further testified that though appellant was her neighbor, she only spoke to him on a few occasions.

From the record:

"Q Mrs. Tallman, you said that Mr. Kircheis here was your neighbor. Did you ever have an occasion to talk with him?

A Well, very little. We did have one conversation, I think on my porch; and I spoke to him as I saw him occasionally.

Q Now, what did this conversation relate to?

A Well, one—this must have been about three weeks before his wife moved in with him, he mentioned the fact that he had gotten married. I said, 'Well, congratulations.' And in answer to that he said, 'This isn't what you think; it's more a marriage of convenience.' And I said—well, you know, to each his own; and he said, 'Well, sometimes it's just more convenient businesswise to be mar-

ried than it is to be single.' And that was the extent—pretty much the conversation. We talked about my pecan cracker—and that was it.

Q That was the extent of the conversation?

A Yes."

This witness further stated that she went out of town that afternoon after her work day was over and did not return until Saturday night and found an ambulance and police cars around the apartment.

Mrs. Carolyn Larmon testified that she and appellant were good friends; that she met him in October, 1973, prior to his marriage in January, 1974. She stated that he called her on the telephone several times before and after his marriage. That he visited her in her apartment both before and after his marriage and they engaged in sexual relations. He told her he loved her and that his marriage was a mistake. He told her he married for business reasons— it gave him a better business report. After his marriage he told her he was going to Las Vegas and asked her to go with him but her employment prevented her from going.

She further testified that subsequent to his marriage, he bought her an outfit— pants and a top for a birthday present and gave her a check for $650.00 because she was out of work and very desperate as far as finances were concerned. She cashed the check but it later bounced. She stated appellant called her from a motel on Thursday before the killing occurred that weekend and asked her to come to his motel but she didn't go. After appellant's arrest and while he was in jail, she visited him on two occasions and carried him money and presents. He told her he wanted to continue their relationship.

Mr. Jack Maloney, Jr., testified for the state. According to his testimony, he knew both appellant and his first wife. He met them in Miami, Florida, and was present at their marriage some time in the year of 1972. Photographs of the wedding party were introduced in evidence over appellant's objection. The court overruled the objections on the ground that the photographs showed they were husband and wife and that Mr. Maloney was an attendant. The court said, "I'm going to let them in for what they are worth. If for nothing else they show the relation of Mr. Maloney to both parties."

Mr. Maloney further testified that appellant came to work for him at his club a few weeks after the wedding. He stated that both appellant and Michael Cook worked for him. He said he had not seen Mrs. Kircheis for a couple of days and he called Cook to go to her apartment and check on her, and that was the reason for Cook going to her apartment and discovering her body.

Mr. Marion Lee Sennett employed by the State Department of Toxicology as a Criminalist testified, after his qualifications were admitted, that the hammer introduced in evidence was brought to the laboratory for examination for fingerprints but he was not able to find any usable prints but did find human blood stains on the hammer.

Three young ladies, all of whom were employed at different branches of the First National Bank of Mobile, Alabama, testified that on Friday, April 12, 1974, they each cashed a $50.00 check drawn on the account of Evelyn M. Kircheis and payable to R. G. Kircheis. That Mr. Kircheis endorsed each of these checks in their presence and that he was driving a white and red automobile. Each of these witnesses were shown copies of the original checks they cashed and identified their "teller" numbers but the court sustained objections to the introduction of the checks because they were not the originals. However, each of these witnesses pointed to appellant in the courtroom and positively identified him as the man for whom they cashed

these checks during banking hours on April 12, 1974.

Mr. Joseph Connick who was employed by the Mobile Police Department testified that on April 13, 1974, he assisted in the investigation of the death of Mrs. Kircheis. In the course of his investigation he learned that the deceased owned a Plymouth Duster automobile, white over red in color; it had a Florida tag. That he did not find Mr. Kircheis in the area of Mobile; that the first time he saw him was on May 31, 1974, in jail in Reno, Nevada. At that time he gave him the *Miranda* rights and warnings by reading to him his rights from a *Miranda* card. That he read appellant these rights in the presence of Captain Kater Williams. That no one in his presence of hearing threatened the appellant, made any promises to him or hope of reward, abused him in any way, nor made any inducements to him to get him to make any statement. After giving him his rights he asked appellant if he understood his rights and he said he did. The officers brought appellant back to Mobile and placed him in the Mobile County Jail where on June 3, Officer Connick gave appellant the *Miranda* rights for the second time.

One Melvin Summerlin, a convict serving a five-year sentence in Quincy, Florida, was called as a witness for the state. He was brought back to Mobile and put in the same cell with appellant. He identified appellant in court.

From the record:

"Q And, Mr. Summerlin, where are you presently residing?

A At this time in the City Jail.

Q I ask you if you know Robert Kircheis?

A Yes, sir.

Q Would you look around this Courtroom and identify him?

A The man on the end over there—the last man.

Q What's he wearing?

A A blue shirt.

Q I'll ask that the record reflect that he identified the defendant, Robert Kircheis. Now, Mr. Summerlin, how is it that you have come to know Mr. Kircheis?

A I've come to know him as a cell mate in the City Jail.

Q What city jail?

A At Mobile City Jail.

Q And when was this?

A July of last year—July or August of last year.

Q All right. Now, while you were in the cell with him, did you ever have occasion to talk with him?

A Yes, sir.

Q Did he ever discuss his wife?

A Yes, sir.

Q Okay. And I ask you what was the nature of that—let me ask you, did you question him about her or did he just volunteer—

A We were talking.

Q All right. What if anything did he tell you about his wife?

A Well, he told me that he was in there for—that he was a suspect of murder of his wife at that time.

Q All right. And did he made (sp) any statements to you about the murder itself —or the killing?

A He told me the night he—in other words, the night that it happened and all that. He told me he went out on the—

Q Relate to us what he said.

A   He said he went out on the town and had come in; he said he had been partying and when he come back in he wanted to have sex relations with his wife and she objected, so he started slapping her around.   Then he said that he had used a hammer and he'd beat her; and he said that when he realized she was dead, he took her car and went and parked it somewhere about three blocks away; and then from there he come back and took a shower; and he got her check book and he cashed some checks on her at a bank down here in Mobile; and then from there he went to Memphis, Tennessee; from Memphis, Tennessee he went to Des Moines, Iowa.   In Des Moines, Iowa he said he opened up another checking account and started cashing checks so he could get money to go to Reno, Nevada.   From Reno, Nevada he said he was apprehended by the F.B.I. That's what he told me.

Q   Did he ever make any reference to anything about a motel in Mobile?

A   Eight Day Inn was the name of it; he said he stayed there the night after he realized she was dead.

Q   Okay.   Did he ever make any mention of a man named Maloney?

A   Yes, sir.   He said he contacted Mr. Maloney the day after the day he realized that she was dead and asked Mr. Maloney if he had seen her—said he had done this for an alibi; and then he said he contacted Mr. Maloney later on in the day.

Q   Now, Mr. Kircheis told you that he was doing this for an alibi?

A   That's what he said."

On cross-examination this witness testified that he was charged with murder in Mobile but pled guilty to manslaughter and received a twenty-two month sentence after his conversation with Mr. Kircheis.   He stated that he was put in the same cell with appellant at the suggestion of Captain Williams who told him that appellant was suspected of murder and wanted him to talk to him and see if he could get any information.   That Captain Williams did not tell him that Mr. Kircheis was a suspect in the death of his wife.   He further testified that he was not promised anything by Captain Williams or any other official.   He said he stayed in the cell with the defendant about two weeks and after he related the conversation the defendant had with him to the officers he was left in the city jail and appellant was transferred to the county jail.   He gave the police a signed statement as to what Mr. Kircheis told him.   He said he talked to the D.A. and he handed him the statement and asked him if that was the statement he had given and he answered, "Yes, sir."

On re-direct examination he testified as follows:

"BY MR. HUGHES:

Q   In the process of these conversations, did you ever threaten Mr. Kircheis to get him to talk with you?

A   No, sir.

Q   It was strictly a voluntary conversation?

A   Yes, sir.

Q   Now, have I, or has anybody from my office, ever offered you anything in regard to this case?

A   Never.

Q   To testify or anything else?

A   Never.

Q   And you don't have any cases pending here now, do you?

A   No, sir.

Q   And you are serving your time down in Florida?

A   Yes, sir."

Appellant testified in his behalf. He denied killing his wife and he denied making any statement to that effect to his cell mate, Melvin Summerlin.

On direct examination he stated that he and his wife had a discussion about their marital status and his drinking problem. That his wife was originally from Florida where she was a school teacher and that she was due two to three thousand dollars. That she suggested that she return to Florida with a friend and he could use her car to seek employment and that she would give him six months to straighten up and they would move back to Florida and resume their 'marriage relationship. He said this understanding took place on April 10, 1974. On April 10, he packed most of his clothes and started to leave town but got to drinking and slept in the car in a parking lot near his apartment. That the last time he saw his wife alive was late in the afternoon on April 11.

He further testified that on Friday, April 12, 1974, he again tried to leave town but got to drinking and decided he couldn't leave and spent the night at a motel—either Day's Inn or Eight Day Inn—on Government Boulevard. He said he left Mobile between 6:00 and 7:00 a. m. Saturday morning. He stated he spent Saturday night in a motel in Memphis, Tennessee, but ended up spending most of the night in a topless joint near the motel. On Monday he went to Des Moines, Iowa, where he spent two days looking for work. From Des Moines he went to Reno, Nevada, where he was arrested by F.B.I. agents on an unlawful flight warrant to avoid prosecution for forgery.

On cross-examination he testified he spent Friday night at a motel in Mobile. It should be noted here that no attempt was made to introduce in evidence his motel registration to support his testimony.

He admitted his relationship with Carolyn Larmon and that he told her he loved her. He admitted asking her to go to Las Vegas but denied that he did so after he married. He also said that he loved his wife and told her that during the time he was going with Carolyn Larmon.

He denied cashing the three checks on his wife's account in the First National Bank of Mobile on April 12, 1974. He admitted cashing a check in Des Moines in the amount of $1,100.00 and that the check was not good, and he knew he didn't have $1,100.00 in his bank account.

He was shown the claw hammer which was introduced in evidence as State's Exhibit No. 17 and said that could be his hammer and that he kept it in a shoe box in the front closet of his apartment.

He admitted that while he was in jail Carolyn Larmon visited him and brought him books and money and that she wrote him six letters and he wrote her the same number.

He stated that he was a fairly well educated man and had nine hours toward his Master's Degree.

On re-direct examination he said when the F.B.I. agents arrested him, they read him his rights and told his he was under arrest for—"charges other than this one."

Appellant made several motions to exclude the testimony of Melvin Summerlin on the ground he was acting on behalf of the police and his confession was involuntary. The court overruled these motions on the grounds that Summerlin was not in a position to offer appellant anything and that Summerlin was not subject to the same rigid test as police officers with reference to the *Miranda* warnings.

Appellant urges this court to reverse this case on the following four grounds:

1. Denial of appellant's motion to dismiss the indictment on grounds that appellant was denied a speedy trial.

2. The court erred in admitting into evidence over appellant's objections

photographs which were cumulative in nature and having no probative value.

3. The court erred in denying appellant's motion to exclude the testimony of Melvin Summerlin.

4. Denial of appellant's motion to exclude the state's evidence and enter a finding of not guilty.

We will treat these claimed errors in the order presented.

Appellant states that the court continued this case twice over his objections and that 307 days lapsed from the time of his arrest until he was brought to trial. One of these continues was due to a motion for change of venue filed by appellant because of widespread publicity and he could not get a fair trial.

■ Some of the factors to be considered by appellate courts in determining whether an accused has been denied a speedy trial are set forth in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L. Ed.2d 101. These factors are: (1) length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant. The defendant in this case has not shown that he was prejudiced in any way. He filed a motion for change of venue on October 18, 1974, and it was not denied until February 26, 1975. Another factor that must be considered is the congestion of court dockets.

In *Giles v. State,* 52 Ala.App. 106, 289 So.2d 673, this court held that a delay of twelve months is not sufficient to show a denial of the right to a speedy trial absent a showing of prejudice to the accused.

In *Gilbreath v. State,* 54 Ala.App. 676, 312 So.2d 81, this court held that a delay of slightly over eight months was not too long where there was no evidence of prejudice to the defendant.

In *Cole v. State,* 52 Ala.App. 447, 293 So.2d 871, this court said:

"There has been no unreasonable delay on the part of the state in bringing appellant to trial. It is settled law that speedy trial rights to not operate to deprive the state of a reasonable opportunity to prosecute defendants. A defendant cannot claim his constitutional rights have been denied where the delay is caused by him, or where delays are made necessary by the law itself, or occasioned by want of time to try the case. *Sample v. State,* 138 Ala. 259, 36 So. 367; *Braden v. State,* 49 Ala.App. 97, 268 So.2d 877.

In *Sellers v. State,* 48 Ala.App. 178, 263 So.2d 156, we said:

'In addition to showing a demand for speedy trial, to make a prima facie case for release an accused normally must also show that actual prejudice resulted from the fact that trial was delayed. *Hoskins v. Wainwright,* 440 F.2d 69 (5th Cir., 1971); *United States v. King,* 431 F.2d 734 (5th Cir., 1970); *United States v. Fitzpatrick,* 437 F.2d 19 (2d Cir., 1970); cf. *Dickey v. Florida,* supra [398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26]. According to *Hoskins,* supra, if the accused relies on passage of time alone to establish prejudice, he can meet this burden by showing (1) that prosecution was delayed beyond the point at which a probability of prejudice arose; (2) that he himself was not responsible for the delay; and (3) that the state ought reasonably to have avoided the delay.' "

■ It is settled law that speedy trial rights do not operate to deprive the state of a reasonable opportunity to prosecute defendants. *Hamilton v. State,* 52 Ala. App. 96, 289 So.2d 663.

■ There was no error in the denial of the motion to dismiss the indictment.

■ There was no error in the admission of the photographs into evidence. Gruesomeness is not grounds for excluding photographs if they have a reasonable tendency to prove or disprove some material fact which is in issue or which at the time appeared to be probably in dispute or material. This is true even though the photographs have a tendency to inflame the minds of the jury and were merely cumulative of detailed oral testimony. *McHugh v. State*, 53 Ala.App. 473, 301 So.2d 238; *Hurst v. State*, 54 Ala.App. 254, 307 So.2d 62; *Stallings v. State*, 249 Ala. 1, 32 So.2d 233.

In *Hurst v. State*, supra, we said:

"Photographs of the deceased and the *locus in quo* are admissible in murder prosecutions when they shed light upon the character and location of the wounds on the victim's body and when the proper predicate has been laid. *Snow v. State*, 50 Ala.App. 381, 279 So.2d 552; *Boulden v. State*, 278 Ala. 437, 179 So.2d 20."

\* \* \* \* \* \*

"There was no error in admitting photographs of the deceased taken at the scene of the homicide five days after he was killed. Concededly, these photographs are unsightly—even ghastly. However, gruesomeness is not ground for excluding evidence consisting of photographs if it has a reasonable tendency to prove or disprove some material fact in issue, or which at the time appeared to be probably in dispute or material, and if it illuminates the issues in any way, and is relevant, it is admissible even though possessing a tendency to inflame the minds of the jury. *McKee v. State*, 33 Ala.App. 171, 31 So.2d 656; *Grisset v. State*, 241 Ala. 343, 2 So.2d 399; *Wilson v. State*, 31 Ala.App. 21, 11 So.2d 563; *Harnage v. State*, 49 Ala. App. 563, 274 So.2d 333, (reversed on other grounds, 290 Ala. 142, 274 So.2d 352)."

■ The court did not err in overruling appellant's motion to exclude the testimony of Melvin Summerlin. Judge De-Carlo, in the case of *Canada v. State*, 56 Ala.App. 722, 325 So.2d 513, released by this court on August 19, 1975, held that a confession obtained through trickery is voluntary. He cited with approval the case of *Commonwealth v. Hipple*, 333 Pa. 33, 3 A.2d 353, wherein the Supreme Court of Pennsylvania held:

"A confession, procured by a trick or artifice, not calculated to produce an untruth, is never vitiated thereby."

In *Lanza v. New York*, 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384, the Supreme Court of the United States said:

"But to say that a public jail is the equivalent of a man's 'house' or that it is a place where he can claim constitutional immunity from search or seizure of his person, his papers, or his effects, is at best a novel argument. To be sure, the Court has been far from niggardly in construing the physical scope of Fourth Amendment protection. A business office is a protected area, and so may be a store. A hotel room, in the eyes of the Fourth Amendment, may become a person's 'house,' and so, of course, may an apartment. An automobile may not be unreasonably searched. Neither may an occupied taxicab. Yet, without attempting either to define or to predict the ultimate scope of Fourth Amendment protection, it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day."

The facts in the case of *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, are clearly distinguishable from the facts in the instant case.

There was no error in overruling appellant's motion to exclude Summerlin's testimony.

There was no error in denying appellant's motion to exclude the state's evidence.

In *Young v. State*, 283 Ala. 676, 220 So. 2d 843, the court held:

"Where the evidence presented raises questions of fact for the jury, and such evidence, if believed, is sufficient to sustain conviction, the denial of a motion to exclude the state's evidence, the refusal to give the affirmative charge and the overruling of a motion for new trial, does not constitute error. *Drummond v. State*, 37 Ala.App. 308, 67 So.2d 280; *Wade v. State*, 24 Ala.App. 176, 132 So. 71."

We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.

The judgment of conviction is affirmed.

Affirmed.

All the Judges concur.