FRED W. NICOL, Circuit Judge.
This is an appeal in forma pauperis from a judgment of conviction of robbery. The jury fixed the punishment at ten years in prison.
The evidence tended to show that on August 26, 1975, at approximately 3:00 P.M., two black males entered the B & B Gun Shop in Huntsville. Upon entry they acted as if they were customers. Appellant went to the watch counter and a companion went to the knife counter. Mr. Charles Beal, the store owner, stooped over to remove a watch that appellant had selected. At this point, appellant pointed a gun at Beal and stated, “This is a holdup you S.O.B. I am going to kill you.” Beal grabbed the gun and was unable to take it away from the appellant. Then Beal was ordered by appellant to move from behind the counter.
While the scuffle was going on, appellant was joined by a companion. Beal was then taken to the rear of the store and tied with some leather strips. Beal was not blindfolded. Appellant held the weapon on Beal. The companion went to the front of the store and took six guns for a value of $899.75. The guns were thrown into a sack. This activity consumed some ten minutes. In a short time Noble Jones came into the store and untied Beal.
In making their escape, appellant and companion went through two parking lots and were observed to pass within six feet of one Bruce Lewis. Lewis testified that they appeared to be the same two men that he had seen running down the street onto the parking lots. Lewis’ description coincided generally with the description given by Beal to the officers.
A call was made to Deputy Sheriff John Hennessey, giving him a description of the vehicle the two men were traveling in, a 1967 gray Pontiac. Hennessey stopped the vehicle and apprehended appellant and his companion. The two men were taken to the Huntsville Police Department and turned over to the Huntsville detectives. The gray Pontiac was impounded.
*131 Within the hour, Beal was taken to the Huntsville Police Department.
Beal testified as follows:
“Q (BY MR. MORGAN:) Are you Mr. Charlie Beal?
“A Yes, sir.
“Q Is that Charlie or Charles?
“A Charles.
“Q O.K., sir, and you are the owner and proprietor of the B & B Gun Shop?
“A Yes, sir.
“Q O.K., Mr. Beal, shortly after you were robbed on or about August 26, I think, of this year, did you have occasion to go to the Huntsville Police Department?
“A Yes, sir, I did.
“Q And did you have occasion to see some people while you were there?
“A Yes, sir.
“Q Did you see Detective Howard Turner here for one?
“A Yes, sir.
“Q O.K., were you shown some individuals there and asked to identify them?
“A Yes, sir.
“Q Would you please state to the Court just exactly what happened from the time you got there and you identified these people?
“A Well, they picked me up after they had a routine check down at the store and saw how many guns was missing and then they carried me on up to the Police Department and—
“Q Who was present please, sir, when you arrived there at the Police Department?
“A Well, really and truly I didn’t see anybody for quite some time because they kept me out in the hall and said they didn’t want me to try to identify anybody this quick.
“Q O.K., sir.
“A So I stayed out in the hall I would say maybe 30 minutes or longer.
“Q Is that in the detective division of the Huntsville Police Department?
Yes, sir. <
"Q And what happened then, after you had sat out in the hall for awhile? <y
"A Well, they finally came and got me and said they would like me to come in the other room. And, of course, this man here was sitting in one side of the little room and when I went by I saw him and I said, ‘There’s one of the men right there.’
"Q Did anybody in that room or in your presence point him out to you and say, ‘This is the one’? <©
"A Not at that time, no, sir. <
"Q Did anyone ask you if you recognized that man at that point? <y
"A Not at that time, no, sir. <
"Q You saw him sitting in a room alone and you said, ‘That is one of them’? o*
"A Well, there was somebody else with him. He was in a small room but there was somebody with him.
"Q Would you describe that person that was with him, if you can? &
"A Detective — now, I have seen so many up there I can’t remember all their names and everything.
"Q O.K., do you recall whether or not the defendant had on handcuffs when you saw him? a*
"A No, sir, not when I saw him.
"Q But you weren’t asked to identify that man? He was not pointed out to you at that time? &
"A No, sir, not at that time. No sir. <
"Q O.K., but you were asked to come on inside and what did you do after you went on in the other room? &
"A I went in there and sat down for about probably 30 more minutes, something like that and then the other one came into the room and went down there and sat down and I said, ‘Well, there’s the other man right there’ so really nobody had to point them out at the time, of course, because I identified them.
"Q Was this man ever brought into the room?
"A Yes, sir, he was.
*132 “Q And that was some period of time later?
“A Yes, sir.
“Q And who brought him in, one of the detectives?
“A One of the detectives, uh-huh.
“Q All right, do you recall the conversation you had with that detective, if any?
“A Well, not really offhand because they just brought them in, both of them in, and sat them — -after that one was in they brought this one in and they sat him down and they, more or less, talking to themselves and I talked to a little policeman and I don’t remember what his name was that had brought me up to the jail.
“Q O.K., at what point did they ask you if you recognized this young man?
“A After both of them was in there.
“Q Did anyone there at any time point this man out to you and say, ‘This is the one we have arrested for this alleged offense’?
“A No, sir.
“Q They just brought him into the room and you identified him?
“A Yes, sir.
“Q And you had already pointed him out as being one of the ones before you even were asked to identify him, is that correct?
“A Yes, sir.”
The appellant, in seeking a reversal of his conviction, insists that the confrontation in this case was so unnecessarily suggestive and conducive to irreparable mistaken identification as to constitute a denial of due process of law.
He maintains that his position is bolstered by the fact that the witness went to detective headquarters only when he learned that suspects had been taken into custody. He contends that the suspects were the only two young black males at said headquarters. The appellant places strong reliance on the case of United States v. Wade, 388 U.S. 218, 228, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).
Much had been written regarding the Wade case, supra. We will not undertake to go into a detailed analysis of the ramifications of this much discussed case. We do not think the procedural standards established in Wade, supra, are applicable to the instant case.
We cite as a similar case and with approval a later case of Russell v. United States, 133 U.S.App.D.C. 77, 408 F.2d 1280, cert. den. 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed. 245, wherein the United States Court of Appeals, District of Columbia Circuit, among other things, had this to say on the topic we are now discussing:
“Even to suggest that the confrontation described might require the presence of a lawyer or that a lineup be conducted seems to me an exercise in stultification. I have no slightest doubt that there is no basis for an intimation that there had been a denial of due process. .
“The use of eyewitness testimony in the trial of criminal cases is an essential pros-ecutorial tool. The recent case of United States v. Wade, [supra] struck a harmful blow at the nationwide effort to control crime. The Court held that an in-court identification of the suspect by an eyewitness is inadmissible unless the prosecution can show that the identification is independent of any prior identification by the witness while the suspect was in custody, and while his court appointed lawyer was neither notified nor present. It is incredible that a victim is not permitted to identify his assailant in court. The same is true of eyewitnesses who saw the victim assailed or murdered. The fact that eyewitness might on some occasion prior to trial have identified the accused, without a lawyer for the accused being present, cannot in reason, law, or commonsense justify such a disastrous rule of evidence. Nothing in the Constitution warrants it. .
“I think this case like many others which are brought here nowadays, should have *133 been disposed of summarily as utterly frivolous.”
In Alabama it has further been held that the right to counsel does not attach to a pre-trial line-up even though it was conducted two days after the offense and the suspect was being held on a specific charge. White v. State, 48 Ala.App. 334, 338, 264 So.2d 565.
The Alabama cases demonstrate that the holding in Wade, supra, simply does not apply in the instant case.[1]
In another Alabama case the rulings of this Court have established that prompt on-the-scene confrontation is consistent with good police work. Cornelius v. State, 49 Ala.App. 417, 272 So.2d 623; Cole v. State, 52 Ala.App. 447, 293 So.2d 871.
One of the more recent cases, decided by this Court March 16, 1976, is Joe Lee Harris v. State, 57 Ala.Cr.App., 329 So.2d 618. This case involved a line-up identification made within one hour of the crime and it held that:
“Lineup identification conducted approximately an hour from the time, of the robbery did not give rise to substantial likelihood of irreparable misidentification even though victim identified defendant as the taller one of the two that held him up and defendant’s alleged accomplice was some five inches taller than defendant.

“Fairness to both the suspect and the victim should inhere in a lineup. The cards should not be stacked against either. The sooner the lineup the greater the likelihood of a correct result.”
There are other Alabama cases in harmony with the above cited cases. We hold that the appellant is not entitled to a reversal based on his pre trial confrontation with the victim, and that the in-court identification in this case was admissible even though there had been a “one-man” feature of the show up.
The appellant also contends that the trial court committed reversible error in admitting into evidence a police property report inventory. He points out that some of the items in the report had been lost or misplaced. We think this argument has no standing under the best evidence rule. See Watercutter v. State, 21 Ala.App. 248, 108 So. 870.
Another contention made by appellant in seeking reversal here is that the court erred in admitting into evidence a pistol without a showing of a proper chain of possession. Of course, we find here that this argument lacks merit and the jurors were, of course, entitled to give this evidence such weight as they deemed sufficient under all the facts duly presented to them in this case. We think the jury could deduce that the appellant was connected to the weapon used in the commission of the crime. Means v. State, 51 Ala.App. 8, 282 So.2d 356, 359, cert. den. 291 Ala. 792, 282 So.2d 359.
We have considered all contentions of appellant and have reviewed the entire record in a quest for any error prejudicial to defendant and have found none. The judgment appealed from is hereby affirmed.
The foregoing opinion was prepared by Honorable FRED W. NICOL, Circuit Judge, temporarily on duty on the Court of Criminal Appeals pursuant to subsection (4) of § 38, T. 13, Code of Alabama 1940, recompiled 1958; the Court has adopted his opinion as its own.
AFFIRMED.
TYSON, HARRIS, DeCARLO, and BOOKOUT, JJ., and SIMMONS, Supernumerary Circuit Judge, concur.

. There is a discussion of the Alabama Rule regarding confrontation in Payne v. State, 48 Ala.App. 401, 265 So.2d 185. See also “Ala.Digest” Constitutional Law” &wkey;226(3) volume 4(a).