269 So.2d 130

**John Henry KING**

**v.**

**STATE.**

**1 Div. 327.**

Court of Criminal Appeals of Alabama.

Nov. 14, 1972.

William H. Card, Jr., Mobile, for appellant.

**112**

William J. Baxley, Atty. Gen., and William T. Musgrove, Jr., Sp. Asst. Atty. Gen., for the State.

TYSON, Judge.

The indictment charged that John Henry King, alias John Henry King, Jr., unlawfully and with malice aforethought, killed Jimmie Perkins by shooting him with a pistol. Jury trial resulted in a verdict of guilty of first degree murder and verdict and judgment fixed punishment at imprisonment in the penitentiary for life.

The deceased, Jimmie Perkins, was found dead at about 6:15 a. m. on January 16, 1972, on Spice Pond Road in Mobile County, Alabama. Charles Pippins discovered the body, which lay along the side of the road, while driving to work on said date. He identified certain photographs as truly and accurately depicting the scene as he observed it.

Doyle Chambers, Detective Sergeant with the Mobile County Sheriff's Department, arrived at the scene at approximately 8:00 a. m. on January 16, 1972. He found the body "lying face down . . . approximately eight to ten feet . . . from the embankment of the roadway with the feet straight out, the arms up over the head and the jacket pulled up over the arms of the body."

Chambers testified that he took a pictorial identification card off of the body which identified the deceased as Jimmie D. Perkins. Chambers further testified that he found no money on the deceased, but that he searched the area around the body and found two ten dollar bills and several coins in close proximity to the body.

Helen Louise Poe testified that she worked at the Night Hawk Social Club in Mobile; that on the night of January 15, 1972, four boys came in the club, one of whom was the deceased; that the deceased ordered a "chicken plate," and the other boys ordered hamburgers; and that they also ordered four "Colt 45's."

When the deceased was paying for the food and drink, he took his money out of his pocket and laid it on the counter in full view. The witness estimated that there

was about $150.00 or more, in denominations of fives, tens, and twenties.

She further testified that as she was leaving the club that night, the deceased and the three other boys were outside the club trying to get their car started. She allowed the boys to use the battery in her car to "boost" their battery. She identified jumper cables as being the ones used that night; she could not identify any one of the three boys with the deceased on that occasion.

As witness for the State, one Vernel Gable testified that in the early morning hours of January 16, 1972, he was at the Night Hawk Social Club in Mobile, and that he saw appellant and a man named Boiken at the club. He did not recall seeing the deceased then.

Deputy Sheriff Willie Estes testified that on January 18, 1972, he, along with Deputy Richard White, arrested the appellant at his residence in Mobile; that he and Deputy White placed the appellant in their patrol car and travelled about a block from his house. There, before any questions had been asked, the appellant was advised of his rights, after which he consented to sign a "Waiver of Rights Form." Estes testified that no one threatened, coerced, or otherwise induced appellant into waiving his rights. Thereafter, said form was introduced into evidence.

Estes testified that after appellant signed the Waiver Form, he asked appellant "if there was anything that we should get before we left." According to Estes, the appellant first stated "that there wasn't, that the gun he had had, had been sold and the boy took it out of the State; but then changed his mind and said, "If we go by his house that he had something to give us." They returned to appellant's residence where, under appellant's direction, Deputy White found a .22 caliber pistol. According to Estes, "He stated to us that that was the weapon that was used the night the boy got killed on Spice Pond Road."

The two officers and the appellant returned to the Sheriff's office, where he was once again advised of his rights by Detective William Travis, and gave the following statement in question and answer form:

"I. The Following is a statement of John Henry King c/m 26 yrs old, as given to me Deputy W. E. Estes of the Mobile Co. Sheriff Dept.

"Q Do you know who I am?

"A Yes sir, you are a Deputy.

"Q How old are you?

"A 26. I was born April 14, 1945.

"Q Where do you live?

"A 1912 Victory Ave.

"Q Did you graduate from High School?

"A Yes sir, from Blout.

"Q This past Sat. night of January 15, 1972, were you J.H.K. in the Mauvilla area?

"A Yes sir, myself, Leo Adams, a C/M named 'James' & a C/M called 'Jimmie' was at the Night Hawk Social Club on Highway 45.

"Q How did you happen to be there?

"A Earlier that evening about 8:30 p. m., Leo Adams & I was at the Glass Ball in 'Bulls Head' we were drinking beer, Leo suggested we go to his girl's house on 1st Avenue in Trinity Gardens so we walked to her house. We drank some wine at her house. That was when I first met 'James.' Leo knew him & said he and James were friends. We were all there drinking wine. We drank some wine & talked about an hour or an hour and a half. Then the boy named Jimmie came in. Leo Adams said he had seen him around before. Jimmie asked if we would like some Gin, we agreed to drink with him. Jimmie mentioned that he had been staying in De-

troit, Mich. We all four stayed there about another hour. Jimmie had a good bit of money on him. James said something to Leo Adams about robbing Jimmie. Leo Adams told me what James had said to him. Leo Adams said 'We gonna clip him' J.H.K.

"Q   Who do you mean by him?

"A   All I can say is his name is Jimmie.

"Q   Henry, would you proceed with your statement.

"Leo Adams, James, Jimmie & myself all left there and went to the Glass Ball in Bulls Head. We stayed there about 45 minutes and had beer. We was riding in light blue or grey car that belonged to the boy named James. It's the same car that is in the basement downstairs now. We left the Glass Ball & went to the Blue Bird in Trinity Gardens. We had a few more beers. We were there just a short while we left there & came back to Leo's girl's house on 1st Avenue we were all four still riding in James' car. Jimmie bought some Gin. I drank some of the Gin then I left & was walking up 1st Avenue. Leo & James picked me up in James' car, Jimmie wasn't with them then. James mentioned to me we gonna take him out & rob him (meaning Jimmie). James asked me if I had a pistol, I said I did. I took a chrome plated .22 cal revolver out of my waist band & gave it to James. Leo Adams said I'll do it & took the pistol from James. We drove back to Leo Adams' girl's house, either James or Leo went into the house & brought Jimmie out. We drove from there to the Night Hawk on U. S. 45. We drank a few beer, I ate a hamburger & James shot a game of pool. We stayed there a good while I'd say over an hour. We came outside the Night Hawk & all four of us got in the car the car wouldn't start. Two ladies came out of the Club, I think they work there in the Club.

.   .   .

"One of the ladies let us hook some jumper cables to her battery & start the car. Leo Adams started the car. He stayed behind the wheel J.H.K. Jimmie got in the front on the right hand side James got in on the left rear behind the driver & I got in the right rear behind Jimmie. Leo started up 45 away from town. James suggested that we go to another Club that he knew about & told Leo to turn off onto a graded road just up from the Night Hawk. Leo turn onto the dirt road, I think we went about a half a block, Leo was driving real slow. I heard a shot inside the car, I realized then that James had the gun. Jimmie just leaned over against the door. About 4 or 5 seconds after the first shot was fired James fired the second shot. I asked James, 'what you did?' Leo stopped the car & got out, James (J.H. K.) got out behind him they both came around to the right side of the car one of them opened the door. I think they both pulled Jimmie out of the car & dropped him beside the car. Both James & Leo Adams were going through Jimmie's pockets. I heard James say 'get the gun because I want it.' Either James or Leo had mentioned earlier that they thought Jimmie had a gun on him. Then Leo Adams & James moved Jimmie a little farther off the road. Then James got in on the driver's side, Leo got in on the passenger side, both of them in the front seat. We turned around there in the road & headed back towards Prichard. James said that we would count the money & split it when we got to Prichard. We stopped in front of Dinwood store on 1st Avenue Trinity Gardens. James had the money on him he counted it there.

"I think there was $145.00. James gave me $42.00. Leo also got $42.00. I got out of the car & went to my girl's house on 1st Avenue. James & Leo Adams drove off in James' car. I think they went to their girl's house. I didn't see James again until tonight here at the

Sheriff Dept. I saw Leo Adams the next day.

"Q Is the above statement true & correct to the best of your memory & in your own words as best you remember?

"A Yes it is. (Answer was printed by J. H. King)"

It was the opinion of Dr. Edwin L. Scott, who performed the autopsy, that the deceased died from a gunshot wound received in the left side of his head.

I

Counsel for appellant argues in brief that it was error for the trial court to receive in evidence appellant's signed confession due to the fact that appellant was unlawfully arrested.

■ Besides the fact that neither before nor during trial did appellant contend or make any motion challenging the legality of his arrest—nor is there any evidence in the record to indicate that appellant's arrest was not in fact legal—it is a well-established rule in this State that even if an individual is illegally detained, such detention in itself does not render a confession obtained during such detention inadmissible. Bridges v. State, 284 Ala. 412, 225 So.2d 821, and cases cited therein.

The confession was properly admitted in evidence as appellant was here advised of his *pre-Miranda* and *Miranda* rights, and there is no evidence in the record to indicate that the confession was not voluntary. See Jackson v. Denno, 378 U.S. 368, 84 S. Ct. 1774, 12 L.Ed.2d 908; Sims v. Georgia, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593; Duncan v. State, 278 Ala. 145, 176 So.2d 840; Taylor v. State, 282 Ala. 567, 213 So.2d 566, cert. den. 393 U.S. 1102, 84 S. Ct. 903, 21 L.Ed.2d 795.

II

■ Appellant further contends that there was no evidence which "corroborated" his confession. It is, of course, well settled that a confession without independent evidence of the corpus delicti is not sufficient to support a conviction. Robinson v. State, 45 Ala.App. 74, 224 So.2d 675; Martin v. State, 44 Ala.App. 395, 210 So.2d 704.

■■ Where, as here, the corpus delicti has been properly proven, and the confession has been shown to be voluntary, such was therefore properly admitted in evidence. While the evidence is ample in its tendencies to establish the appellant's participation in the offense charged, there is no requirement in law that appellant's confession be "corroborated." Cases cited, supra.

III

■■ The fact that appellant may not have fired the fatal shot does not bar his conviction, as one who aids another in the commission of a criminal offense is as equally responsible as the actual doer of the act. Brown v. State, 41 Ala.App. 641, 148 So.2d 255. The law also provides that every homicide committed in the perpetration of a robbery is murder in the first degree. Title 14, Section 314, Code of Alabama 1940, Recompiled 1958.

We have carefully examined the record, Title 15, Section 389, Code of Alabama 1940, Recompiled 1958, and find same to be free from error. The judgment of conviction is due to be and the same is hereby

Affirmed.

All the Judges concur.