327 So.2d 749

**David Wayne TANNER, alias**

v.

**STATE.**

**7 Div. 374.**

Court of Criminal Appeals of Alabama.

Feb. 17, 1976.

William J. Baxley, Atty. Gen. and Milton C. Davis, Asst. Atty. Gen., for the State.

Otis J. Goodwyn, Gadsden, for appellant.

BOOKOUT, Judge.

Embezzlement; sentence: six years imprisonment.

Charles Fordham testified for the State that he was the owner of Fordham Transfer Company located in East Gadsden, Alabama. He stated that the appellant, David Wayne Tanner, was employed by him from September 1971 through October 1974, and on two previous occasions. Fordham Transfer Company had a contract with Goodyear Tire Company in Gadsden, hauling tires from the Goodyear plant to two Goodyear warehouses, all located in Gadsden.

Fordham testified that 988 passenger, truck and tractor tires were shown by inventory to be missing between February and August of 1974. He stated the value of the tires to be $33,000.00. The appellant drove a truck, hauling the Goodyear tires, for Fordham.

Police Sergeant W. A. O'Bryant testified (outside the presence of the jury) that

he met with the appellant on November 18, 1975, in a meeting in the office of the Captain of Detectives of the Gadsden Police Department. Present at the meeting were Assistant Police Chief Gerald Diggs and Bill Sine, an investigator for Goodyear from Akron, Ohio. The appellant had been contacted by telephone, and a police car was sent to pick him up since he had no transportation. O'Bryant stated that the appellant was not under arrest at the time, but had been under investigation. The witness stated that after appellant arrived:

"Well, I just told David at the present time that there wasn't any charges against him; that we didn't know at a later date whether there would be any charges or not, but as a precautionary measure I did explain the Miranda Warning to him; I filled out the form; I read it to him; he read it; he signed. It was witnessed by Chief Diggs and Bill Sine."

That form, entitled "Waiver of Counsel by Defendant in Custody," was admitted into evidence as State's Exhibit No. 1. After the statement was read and signed, the appellant proceeded to give a statement to the officers present concerning the missing Goodyear tires. The State laid the predicate as to voluntariness of the appellant's inculpatory statement, and counsel for appellant requested the right to cross examine at that point.

On cross examination, it was shown that the appellant had met with various law enforcement officers on several occasions prior to November 18th. The witness stated that the first meeting was held at a local motel. Present on that occasion were F.B.I. Agent George Oaks, Chief Diggs, Bill Sine, Sergeant O'Bryant, the appellant and Ronnie Cox.

The witness stated that Chief Diggs questioned the appellant about the missing tires:

"Q. What did he tell him?

"A. He was just asking about the theft of the tires which David voluntarily told us about.

"Q. Also Chief Diggs told to him that he was not interested in prosecuting him; that he was interested in prosecuting a number of other people, didn't he?

"A. Not to my knowledge, no, sir."

The witness testified concerning a later meeting at the same motel, on the following night, attended by the same people. To the best of his knowledge, it occurred in September, but no exact date was given. The following occurred:

"Q. At that time were more names discussed?

"A. There were several names discussed.

"Q. Tell us what names were discussed at that time.

"A. The ones that I recall as far as being involved under the investigation was Clyde Tidmore, Billy Garrett, Chuck Jackson.

"Q. Now, when the name of Clyde Tidmore got into the conversation who brought that in? Did you bring it in or did Chief Diggs bring it in?

"A. David Tanner.

"Q. At that time did Chief Diggs make this statement or this in effect: That the man he wanted was Clyde Tidmore?

"A. No, sir.

"Q. And that if David Tanner would make a statement involving Clyde Tidmore that he would grant him immunity, that he would never be prosecuted?

"A. No, sir.

"Q. That didn't happen?

"A. No, sir."

The witness testified concerning a third meeting in another motel, but did not recall

that date. To the best of his knowledge, Bill Sine, Chief Diggs, Ronnie Cox, the appellant and the witness were present. The following occurred:

"Q. Chief Diggs questioned David?

"A. Yes, sir, we all did.

"Q. You questioned him?

"A. Yes, sir.

"Q. Bill Sine questioned him?

"A. Yes, sir.

"Q. Chief Diggs tell him then that if he would make a statement involving Tidmore and these other people that he would grant him immunity?

"A. No, sir, not in my presence.

"Q. That he would see that he was not prosecuted and wouldn't have to serve a day?

"A. The only thing I have ever heard Chief Diggs say as far as prosecution was it wasn't up to him, that it would be up to the proper official whether he was prosecuted or not.

"Q. Did you hear him make this statement that no warrants would be issued—

"A. —No, sir, not in my presence.

.    .    .    .    .    .

"Q. And no statements, no promises or anything were made by Chief Diggs to get him to make a statement?

"A. No, sir.

"Q. No offer of immunity?

"A. No, sir."

The witness emphatically stated on direct and cross examination that no promises or threats were made by anyone in his presence to the appellant during the meetings which he attended.

Chief Gerald Diggs was called as a defense witness (outside the presence of the jury) and was questioned concerning the three meetings with the appellant at local motels and the meeting at the police station on November 18th. He emphatically denied making any promise of immunity to the appellant at any of those meetings. He denied telling the appellant that he really wanted Clyde Tidmore and not the appellant. He denied telling the appellant that no warrants would be issued against him.

William R. Sine, Investigator for Goodyear, was called by the defendant (outside the presence of the jury). He testified as to meeting with the appellant at a local motel. Present were: F.B.I. Agent George Oaks, Ronnie Cox from the Sheriff's Department, Sergeant O'Bryant, Chief Diggs and the appellant. The following testimony, in pertinent part, was given:

"Q. Do you recall Chief Diggs stating something to the effect that if David would cooperate that he would grant him immunity?

"A. No, sir. He did say that he would talk to the District Attorney.

"Q. Do you recall his making the statement that if he would cooperate on Clyde Tidmore that he would not have to serve a day?

"A. No, sir. May I explain how what I believe you are talking about?

"Q. Yes, sir.

"A. I could be wrong. I want to make sure I'm with you on the same track. David was told by Chief Diggs that if he cooperated that Goodyear would probably not be interested in prosecuting him, him himself, David Tanner, and this was the case. I was a little hesitant about doing this, but as it turned out this was the case.

"Q. What he said, he said if he would cooperate that Goodyear would not prosecute him?

"A. Goodyear was not interested in prosecuting David Tanner.

"Q. Did he further that statement by saying that he would not have to serve a day?

"A. No, sir, I do not recall that.

"Q. Did he further that statement by saying that no warrants would be issued against David Tanner?

"A. No, sir, I do not recall him saying that.

"Q. Did he make any other offer that you recall? Did he say 'I will grant you immunity from prosecution or words to that effect?

"A. I definitely did not hear anybody say anything about immunity.

"Q. Did you hear anything about offering him a job as an undercover agent with the FBI?

"A. No, sir."

Sine testified as to another meeting in a local motel with the same persons present. He was questioned about that occasion in part as follows:

"Q. You didn't hear him make the statement that if he would cooperate and get Clyde Tidmore that he would grant him immunity?

"A. No, sir, I can honestly say I did not. After the first meeting with David I don't believe this was discussed anymore. After the first meeting at the Travelers Eight when David was told by Diggs that Goodyear was not going to prosecute him. I don't recall—

"Q. —if he cooperated?

"A. Yes, that is true.

"Q. All right. Now, how long did you stay there on this occasion?

"A. Maybe a couple of hours.

. . . . . .

"Q. And after the first discussion about Goodyear would not prosecute him if he would cooperate you never heard any further discussion about promises or anything?

"A. Not that I recall."

The witness stated that the appellant never requested to call a lawyer while in his presence. He said that in talking with the District Attorney, no promises were made by the District Attorney. He stated that it was understood that Chief Diggs would talk to the District Attorney if the appellant had cooperated and inform District Attorney the appellant had cooperated with the investigation. There was no agreement that the appellant would not be sentenced, "Only the fact that Goodyear would probably not prosecute." He stated that the District Attorney made no statement concerning probation.

Sergeant O'Bryant was recalled and questioned (in chambers) concerning any possible promises the District Attorney may have made. He said probation may have been discussed, however, that was concerning a discussion between law enforcement officers and the District Attorney before issuing the warrant, and did not reflect any promise made to the appellant to induce him to make a statement.

Chief Diggs was recalled by the defense (in chambers):

"Q. And after that meeting in Mr. Rayburn's office and before you got the statement you again talked with David Tanner?

"A. I didn't, no, sir.

. . . . . .

"Q. You didn't go to David Tanner and say that everything was all right, that you had cleared it with Mr. Rayburn, that after he made the statement or gave you a written statement that Mr. Rayburn had agreed to try Tidmore and Jackson first?

"A. No, sir.

"Q. And after that his case would be taken care of, that his case would be tried last?

"A. At the time I talked to Mr. Tanner there were no charges placed against him whatsoever.

"Q. Yes, sir. But I'm talking about—

"A. —The only time that I made a statement—that I saw the statement is when Mr. Sines (sic) and Sgt. O'Bryant and myself come (sic) to the District Attorney's office."

Chief Diggs stated that he did not recall having a meeting with the District Attorney, Mr. Sine and Sergeant O'Bryant prior to getting the appellant's statement. He only remembered going to the District Attorney's Office on the day the warrants were obtained by Sergeant O'Bryant, which was after the appellant's inculpatory statement had been given.

Sergeant O'Bryant was again recalled by the defense (in chambers). He was asked if he recalled being present at a meeting with Mr. Sine, Chief Diggs and the District Attorney, wherein the District Attorney stated that in the event the appellant gave a statement and cooperated, that Jackson and Tidmore would be tried first and the appellant's case would be handled last. The witness stated that he did not hear any such statements made in his presence.

The defense then recalled Mr. Sine and questioned him (in chambers) concerning any conversations with the District Attorney. He stated that he did not meet with the District Attorney until after the appellant's inculpatory statement had already been made, stating:

"I recall that Mr. Rayburn and Mr. Lummis had decided that Goodyear would not sign the affidavit, that the matter would be turned over to the Grand Jury and then if Mr. Tanner was indicted that's the way it would be."

The witness stated that in the initial conversation with the appellant that F.B.I. Agent George Oaks informed the appellant that he could not make any deals with him, that he would talk to the federal attorney in charge and say that the appellant had cooperated. The witness said Oaks made this clear to the appellant prior to the reading of his rights and the signing of the waiver (State's Exhibit No. 1). On cross examination by the District Attorney, the witness stated that no one present threatened the appellant in order to obtain the statement; that no one told him it would be better for him if he gave a statement or worse for him if he did not give a statement; and no one offered him any reward or hope of reward if he gave a statement.

Mr. Sine stated that the appellant signed the inculpatory statement, which was taken in his presence, and that he witnessed the statement. He testified as to what the appellant had verbally told him and the other officers concerning the offense:

"He began with telling how he got involved with certain individuals in removing tires from the Goodyear Warehouses in lots of four and eight and then it worked its way up tile (sic) load of thirty, how he became involved with other businessmen here in the area, how he felt that the big man was going to go free walking the streets while he had to pay for it, he didn't mind going to jail himself as long as the big man that was using him also suffered a like consequence, how they switched the seals on trailers, how they had intended eventually to take a whole trailer consisting of 900 to a thousand tires, where they met . . . ."

The appellant, David Wayne Tanner, took the stand in his own behalf (in chambers) to testify concerning the admissibility of his inculpatory statement.

Tanner said his first conversation with Chief Diggs was August 28, 1974, when the Chief and Lieutenant Matthews approached him on the platform at the Goodyear plant. They told him they were going to take him into custody and ask him a few questions about the theft of tires. They took him to a captain's office at City Hall. On the way, Chief Diggs told him that he had been meeting with Goodyear officials, and they knew that appellant had taken the tires and all that Goodyear wanted was their tires back. Appellant testified that he then told the officers that if he was under arrest, he needed to notify his lawyer, and Chief Diggs told him that if he started talking about a lawyer then he was in trouble. Appellant said on that occasion he denied any knowledge of the theft.

The next confrontation was on September 18th in Fordham's office where Chief Diggs told him he wanted to talk to him some more about the tire theft. Diggs asked him to come to police headquarters the next morning. He went there and stayed about fifteen minutes. He agreed to take a lie detector test, and they proceeded to the Ramada Inn and met Jerry Black who was working for the county. Ronnie Cox was administering the polygraph test to the Goodyear employees at the time. They met again the same day at 2:00 P. M. in Chief Diggs' office, at the Chief's request to talk about the persons involved in the theft. He said Diggs told him he wanted the man at Goodyear, that he wanted Clyde Tidmore, Richard Wolfe and Nasty Sparks. Diggs told him that if he wanted to be a man about it, he could be an informant for the F.B.I.

The next morning at 8:00 A. M., he left with Ronnie Cox and Chief Diggs to go to Birmingham for a meeting with F.B.I. Agent Ralph Miles. He said Chief Diggs told Ralph Miles that he could not trust the local F.B.I. representative in Gadsden. He said no promises were made to him for his cooperation at that time and no statement was given to Mr. Miles. On the

way back to Gadsden, Chief Diggs wanted the appellant to take the code name Joe Davis and that, "it was more or less an understanding that he wanted to get to Clyde Tidmore," and that the appellant was to use the code name if he wanted to contact the Chief.

Appellant stated that the next meeting with the Chief was on Monday, September 23rd. They met at the Travelers Eight Motel. Those present were: the appellant, Ronnie Cox, William Sine, Chief Diggs, Sergeant O'Bryant and F.B.I. Agent George Oaks. Appellant stated that on that occasion Chief Diggs told him that he was not interested in prosecuting him, then looked over to Sine and said, " 'I feel like Goodyear will do the same provided he cooperates.' " Sine nodded in the affirmative, but said nothing. He was asked about Mr. Oaks' participation, and he stated:

"Mr. Oaks—When we first got there Chief Diggs took charge of the conversation and after them two made the two promises George Oaks in return says 'I cannot do that because it is unethical,' that all he could do was to go to the Magistrate. He said that he didn't know what his participation, the Federal people, would be involved in this thing, that if I cooperated he would go to the U.S. Magistrate and tell him that I had cooperated."

He said the next meeting was approximately 11:15 P. M. the night of September 23rd. He was picked up by Ronnie Cox and taken to the same motel again. Those present were: the appellant, Ronnie Cox, William Sine, Chief Diggs and Sergeant O'Bryant. George Oaks was not there. He stated that the officers were still talking in terms of not prosecuting him and discussed other people who might be involved.

Appellant said the next meeting was the next night at approximately 11:30 P. M. On the way to the meeting, they stopped

and bought a six pack of beer and took it with them. This meeting was at the Holiday Inn. Present were: the appellant, Chief Diggs, Ronnie Cox and William Sine. O'Bryant came to the meeting later. Appellant said Chief Diggs continued to say that they wanted Clyde Tidmore and others and that the Chief was still talking about "non-prosecution," if the appellant would continue to cooperate.

Appellant said the next meeting was October 4th in Chief Diggs' office, with Chief Diggs, William Sine and the appellant present. He said they continued to make promises. On that occasion they wanted to confirm a statement he had made on October 1st to William Sine at the Goodyear plant. He stated that he made a statement on October 1st after being told that Fordham did not have proper insurance to cover the shortages and that his statement was needed for Goodyear to take a tax writeoff and his only punishment would be being barred from the Goodyear premises. Appellant stated that he gave the statement to protect his father's job, as his father worked for Fordham, and because he was promised that Goodyear would not prosecute and that they merely needed the statement for a tax loss.

Appellant said that he was discharged from Fordham on October 8th and on November 16th was called by Sergeant O'Bryant who told him that Chief Diggs needed his help and asked him to come to City Hall. He arrived and spent approximately two hours. He went back on November 18th at approximately 2:30 P. M. and stayed until 10:00 or 10:30 that night. On that occasion, he signed another statement. He said that before he signed it, Chief Diggs stated that he had been to the District Attorney's office and that the District Attorney was going along with the entire program if appellant would turn State's evidence against Clyde Tidmore. He said Chief Diggs stated that he was not going to prosecute appellant if he would

sign a statement involving Clyde Tidmore. He said the Chief told him he would get him a job if he would cooperate to get Tidmore, and that he would help him in any way possible concerning immunity, representation by counsel, making bond, etc.

Appellant was asked if Chief Diggs told him about the results of the meeting with the District Attorney, and he said:

"Yes, sir. he said that there were going to be six warrants issued, one for Mr. Hayes at Rainbow Shell, one for Mr. Jimmy Hammett, one for Billy Garrett, one for Clyde Tidmore, one for Chuck Jackson and one for *myself*. (Emphasis supplied).

He said he was told that the only way that the District Attorney would go along with the police was to issue a warrant for appellant, try his case last, wherein he would plead guilty and get two years on probation. He said that after this was told him, he made a statement. Appellant said the original statement to Sine at Goodyear was used wherein the officers inserted changes, and he signed it. He said he signed the waiver after he had been promised total immunity and a job. He said that after the statement was signed, Diggs, Sine and O'Bryant carried him home and they were laughing and joking and when he got out of the car, Sine told him not to worry. He was arrested the next day and taken to jail. After that he never heard from the officers, and he was totally on his own.

Appellant called F.B.I. Agent George Oaks as a witness (also in chambers). Oaks refused to testify without receiving permission from the Justice Department and was excused.

Ronnie Cox, an employee of the Sheriff's Department, testified concerning the meeting at the local motel with the appellant, Chief Diggs, William Sine and George Oaks. He stated that one time during the conversation, Chief Diggs told

Tanner that he would not be prosecuted if he cooperated and made a statement to Mr. Sine concerning prosecution by Goodyear whereupon Mr. Sine replied that Goodyear was not interested in prosecuting the appellant.

The witness stated that F.B.I. Agent Oaks stated that he did not speak for the Justice Department or the Magistrate, but that if the appellant cooperated, he would go to bat for him and tell the Magistrate or his superior that appellant cooperated and it would go better or easier on the appellant. Cox was asked about the meeting at the Holiday Inn and if promises were made to appellant. He stated, "Well, you are speaking of something that was made all along. I can't remember exactly when it was made or what. I mean it was said several times. It could have possibly been said the second time, but I can't say for sure." He stated that all present were drinking, however, Chief Diggs had denied that any drinking occurred on this occasion.

Cox was asked about the trip to Birmingham to see the F.B.I. agent-in-charge, and he stated that during the trip there was a repetition of the promises previously made, that the appellant would not be prosecuted by the city or by Goodyear if he cooperated. He said Chief Diggs promised appellant three times, and told the witness once, that Diggs would not prosecute the appellant. One occasion was at the City Hall in the presence of Jerry Black, a special deputy.

Jerry Black was called by the defense (out of the presence of the jury). He stated that he was a special deputy sheriff and that he helped Deputy Cox at times with the polygraph. He was not certain of the date, but testified that around September 20th or 21st he overheard a conversation between Chief Diggs and the appellant, that if appellant would cooperate in getting the rest of the people involved in the tire theft that, "they could get him out of it. In other words, he wouldn't get anything." He said Chief Diggs was trying to get appellant to sign a statement or make a confession at that time and promised appellant that he would not get any time at all if he would cooperate and get the rest of the people. He said he heard the Chief promise this no less than three times during a period of four hours.

The District Attorney and defense counsel made arguments to the trial judge concerning admissibility of the confession of appellant, and the trial judge overruled the appellant's objection and admitted into evidence the testimony concerning the appellant's verbal confession and likewise admitted the two written statements.

The jury was returned to the courtroom, and Mr. William Sine testified on behalf of the State. Miss Diane Leonard, who typed the appellant's statement, testified on behalf of the State, and then the defense put on Jerry Black and Ronnie Cox as witnesses. The State called William Sine, Gerald Diggs and Sergeant O'Bryant as rebuttal witnesses.

The State's testimony was to the effect that no promises were made by the State to the appellant that he would not be prosecuted if he cooperated and signed the statement. Witnesses Black and Cox testified substantially as before. Following the testimony of Mr. Oaks, in chambers, defense counsel had him subpoenaed and he again claimed that he was immune from testifying. He stated that he had been in touch with the Assistant United States Attorney in Birmingham and was ordered not to testify, however, the defense could make proper application through the United States Attorney which would be considered. The court stated: "Well, I am going to grant his request to not appear as a witness in view of the fact that you have not followed the prescribed procedure to get him to testify." To which, the defense excepted.

The written statements, signed by the appellant and introduced into evidence, constituted a full confession by the appel-

lant as to his part in the embezzlement and theft of the tires. The contents of the confession as to the mechanics or scheme of the crime need not be set out here.

At the end of the case, the defendant moved to exclude the evidence and discharge the defendant, without stating grounds, which was overruled by the judge. At the end of the court's oral charge, both the State and the defendant announced that they were satisfied.

I

Appellant contends that his confession was not voluntary and thus should not have been admitted into evidence.

The evidence is in sharp conflict as to whether or not Chief Diggs, Bill Sine or others promised the appellant either total immunity or probation as an inducement for him to make a confession. Each officer, as well as Sine, denied making any promises to the appellant. Sine stated that he made no promises, but Chief Diggs told the appellant that *Goodyear* would probably not be interested in prosecuting him. Sine said that he, as an agent of Goodyear, did not have authority to make that statement and thus did not make such a promise to the appellant.

Although George Oaks did not testify, there was testimony from other witnesses that he made no promises to the appellant. There was testimony that Oaks told the appellant that he could not make any promises to him, but that he would inform the United States Attorney of any cooperation of the appellant, if a federal charge was made.

The witnesses that had met with the District Attorney likewise testified that no promises were made by the District Attorney concerning probation or immunity. The appellant testified that he was promised total immunity by Chief Diggs. Later in his testimony, he stated that Goodyear promised that he would not be prosecuted if he gave them a statement which they needed for tax purposes and that he would only be barred from the Goodyear premises. Appellant's later testimony became confused in regard to whether he was being promised immunity or probation. He testified that he was told that he would be arrested, but would be tried last and would be given probation.

■ Both witnesses Ronnie Cox and Jerry Black testified that Chief Diggs promised the appellant immunity. It is well settled that extrajudicial confessions are presumed to be involuntary, and the burden is upon the State to establish voluntariness. Our Supreme Court has stated that the test to be used is, "whether, under all the surrounding circumstances, a confession has been induced by a threat or a promise, express or implied, operating to produce in the mind of the prisoner apprehension of harm or hope of favor." The duty to determine whether or not a confession is voluntary rests on the trial judge. *Wallace v. State*, 290 Ala. 201, 275 So.2d 634 (1973); *Womack v. State*, 281 Ala. 499, 205 So.2d 579 (1967). The *Wallace* decision was a comprehensive *per curiam* opinion by the Court dealing with the question of the voluntariness of a confession. The Court held that a confession, after a Miranda warning, was not involuntary due to the fact that a detective told the accused a probation officer could be told that the accused told the truth, if he gave the detective a truthful statement. However, in *Womack*, supra, the confession was held to be involuntary where the sheriff told the accused that it would go lighter on him if he made a statement.

■ The person inducing an accused to make an inculpatory statement need not be a law enforcement officer. In *Allen v. State*, 53 Ala.App. 66, 297 So.2d 391 (1974), cert. denied 292 Ala. 707, 297 So.2d 399, this Court held a confession to be involuntary which was made to a person, not a law enforcement officer, who could have been fairly supposed by the defendant to have the power to secure the promised ben-

efit for the accused. However, the evidence in the instant case does not convince us that the appellant was lead to believe that Goodyear had the sole discretion as to whether or not he would be prosecuted. There is ample evidence that the appellant was made aware that although Goodyear may not wish to press charges, the state or the federal government could do so.

In *McNair v. State,* 50 Ala.App. 465, 280 So.2d 171, cert. denied 291 Ala. 789, 280 So.2d 177 (1973):

"This Court has previously recognized the fact that it is not unusual for the voluntariness inquiry to present conflicting evidence. . . . When such a conflict occurs and the trial judge finds that the confession was voluntarily made, great weight must be given to his judgment. This finding will not be disturbed on appeal unless the appellate court is convinced that the conclusion is palpably contrary to the weight of the evidence. . . . Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty. . . ." (Citations omitted).

The United States Supreme Court in *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), held it to be constitutional for a state to prove voluntariness of a confession, "by a preponderance of the evidence."

■ We believe the trial judge's ruling in the instant case was supported by "substantial evidence" or "a preponderance of the evidence" and should not be disturbed by this Court on appeal.

■ Neither do we find the statement purportedly made by F.B.I. Agent George Oaks to have affected the voluntariness of the confession. The Fifth Circuit Court of Appeals has held that a confession is not rendered involuntary, "by reason of the single fact that the FBI agents told him that if he cooperated with them his cooperation would be made known to the United States Attorney, that there might be some consideration given by the United States Attorney but that the agents could make no promises." *United States v. Frazier,* 434 F.2d 994 (5 Cir., 1970).

II

The appellant contends that there must be independent proof of the corpus delicti in a criminal case before a confession may be admitted into evidence.

The first witness in the instant case, Charles Fordham, testified that 988 tires were missing from his inventory between February and August of 1974. He stated the value of the tires to be $33,000.00.

■ It is true that a confession without independent evidence of the corpus delicti is not sufficient to support a conviction, and the burden is upon the State to prove the corpus delicti independently of the confession. *King v. State,* 49 Ala.App. 111, 269 So.2d 130 (1972); *Robinson v. State,* 45 Ala.App. 74, 224 So.2d 675 (1969). However, proof of the corpus delicti does not necessarily include evidence connecting the defendant with the crime. The term corpus delicti means the body or the substance of the crime and connotes the commission of the offense by the criminal agency of someone. *Latham v. State,* 38 Ala.App. 92, 77 So.2d 499, cert. stricken 262 Ala. 108, 77 So.2d 502 (1954); *Malone v. State,* 37 Ala.App. 432, 71 So.2d 99, cert. denied 260 Ala. 699, 71 So.2d 101 (1954).

■ On cross examination, Fordham was asked how he determined the figure of 988 tires to be missing. He said the number was first given to him by Goodyear and that he checked his bills of lading and verified it. The count was conducted by

Fordham and one of his office employees. He was then asked how he determined the value of the tires. He stated that he was charged with the claim for the loss of them, and on redirect examination, stated that the $33,000.00 value was his best judgment. We deem the testimony of Charles Fordham sufficient to establish the corpus delicti, and such testimony coupled with the confession of the appellant is sufficient to support a conviction.

### III

Appellant contends that the trial court committed error by refusing to require F. B.I. Agent George Oaks to testify.

Contrary to appellant's contention, we find *Holt v. State,* 46 Ala.App. 555, 246 So.2d 85 (1971) to be controlling. There we stated:

> "The first claim of error arose from the denial of a ten day continuance because an F.B.I. agent under subpoena took umbrage under an order of the Attorney General of the United States. The witness respectfully declined to testify about an investigation of certain Birmingham police officers, claimed to have breached Holt's civil rights.

> "We find no timely motion by Holt to request that the Attorney General of the United States make provision for the production of the information. The lack of such a motion made well before the day of the trial suffices to support the ruling of the trial court. *Parsons v. State,* 251 Ala. 467, 38 So.2d 209; Anno. 165 A.L.R. 1302. There was no error in denying the continuance." (Footnote omitted).

 In the instant case, appellant sought to produce Agent Oaks as a witness on the day of the trial. When Oaks declined to testify without permission from the United States Attorney, appellant sought a continuance until permission was granted. The trial judge refused to grant the continuance, but during the course of the trial, it was made known that the United States Attorney in Birmingham had declined the request for Oaks to testify, but that any formal request made pursuant to federal regulations would be considered. Appellant then subpoenaed Agent Oaks, and the trial judge declined to order him to testify.

*Holt* clearly applies in the instant case. The trial judge was not in error for refusing to make Agent Oaks testify where no timely motion was made requesting permission of the United States Attorney.

Affirmed.

All the Judges concur.