DeCARLO, Judge.
Murder; life.
The State has filed a motion to strike the court reporter’s transcript of the evidence and to dismiss the appeal, contending that the transcript was not filed with the circuit court within the time allowed by law. Under Rule 2, A.R.A.P., we exercise our discretion and review the record.
On October 9, 1974, Daisy Johnson, cashier at Delchamps in Montgomery County, Montgomery, Alabama, was present during a robbery of the store in which Crawford Herring, an employee, was shot and killed. She testified that, at approximately 8:30 P.M. on the evening of the alleged incident, she was operating cash register number four when she heard a “clatter at the door like something hit the glass.” When she turned around, she saw “these men standing there with shotguns.” According to Johnson, two men stayed at the front, one holding a shotgun and one holding a pistol and the others dispersed in different directions over the store. She said that the men were dressed in dark, long coats and wore ski masks.
The man with the pistol pointed it at her and attempted to open the register. When he was unable to open the register, she opened it, removed the money, and placed it in a bag which he had slung over his shoulder. Johnson stated that another man stood at the front holding the shotgun on the other people in the store. All were directed to lie on the floor, face down. While lying on the floor, she heard one of the men tell Crawford Herring “to get up and open the other register.” According to Johnson, Crawford got up and opened the register. She then heard the man say, “This white man thinks I’m playing.” At that point, she heard a gunshot and after the shot, she heard the man say, “Let’s go.” She then heard “a lot of people running,” as the men were leaving the store.
Johnson testified that she was afraid during the incident. When she got up after the robbers were gone, she saw Herring lying on the floor in a puddle of blood. He had been shot in the neck and was not breathing. Further, the witness stated that there was a nurse in the store and, after examining Herring, she determined that he was dead. The police, the manager and the assistant manager of the store arrived later.
Johnson could not identify any of the people who had robbed the store. She recalled that she was directed to open the register by the man holding the pistol.
During cross-examination, the witness acknowledged that she could not identify the voices of any of the men involved in the robbery. She stated that, when the men first entered the store, the man with the shotgun approached her register and said, “This is a holdup,” or, “This is a robbery.” According to Johnson, the man with the pistol was standing beside the man with the shotgun.
On the night of the robbery, Floyd Stin-son had gone to the Delchamps Supermarket to make some purchases. He testified that he was there at approximately 8:30 P.M., when four men ran into the store. Two of them ran to the back and two stayed at the front. Stinson said that all the men wore masks over their faces and that one of the two men who remained at the front of the store carried a shotgun while the other man held a pistol.
Stinson described the man holding the pistol as approximately five feet and seven inches tall and weighing about 140 pounds. The witness described the pistol as a .38 with a long barrel. He stated that the armed man removed the money from the register and placed it into a bag.
Stinson testified that, after he got on the floor and immediately before the men ran from the store, he heard a shot. He said that, after the men left the store, he saw Herring lying in a puddle of blood with a hole in his neck.
During cross-examination, Stinson acknowledged that the leader appeared to be the man armed with the shotgun. Stinson recalled that, when the money was being removed from the register, the man with the pistol said, “Get it all.”
*1207 Sixteen-year-old Mickey Hodge was working at Delchamps on the evening of the robbery, and he, along with Harold A. Henderson, was in the “ware room” at the time of the robbery. Hodge testified that, as he was about to go to the front of the store, one of the men wearing a mask rushed through the door to the ware room and asked, “Is there anybody upstairs?” Hodge recalled that he informed the man that no one was upstairs. The man then left and went back to the front of the store. Hodge said that, after a second, the man came running back to the ware room and ordered, “Get on the floor.” The witness said that a “sawed off shotgun” was in the man’s hand and that he and Harold fell to the floor. When the man turned and ran back through the ware room to a door toward the front of the store, Hodge heard a loud noise like a shot.
According to Hodge, after a minute, he heard a noise at the back of the building. When he looked out the back door he saw a group of men running down the street, all dressed in masks and overcoats. Hodge closed the back door and locked it, then walked to the front of the store. He said that Daisy Johnson was yelling that “they shot Crawford and to call the police.” Hodge saw Crawford Herring, bleeding from the back, lying near register number two. He said that Herring did not moan or say anything at that time. During further questioning, Hodge stated that he had never had a “sawed-off shotgun” pointed at him before the robbery at Delchamps and that he was afraid.
Harold Henderson, Jr., an employee at Delchamps on the night of the robbery, gave testimony which was substantially the same as that given by Mickey Hodge. Henderson stated that he saw approximately four or five men running down the street when he and Hodge looked out the back door after the robbery.
Wayne Bullard was the assistant manager of Delchamps on the evening that it was robbed. He testified that he was called to the store where he checked the registers and determined that $630.00 had been taken during the robbery. On the night of the robbery, Bullard saw Herring lying on the floor in a puddle of blood near the second register. Bullard said that it was his observation that Herring was dead.
Detective Cecil H. Humphrey of the Montgomery Police Department investigated the Delchamps’ robbery on the night of its occurrence. He testified that he found several shotgun shells outside, strewn from the front door, south, to Hannon Street, then, west, toward the rear of the store. According to Humphrey, about ten, twenty gauge shotgun shells were found, and only one shell was spent or fired. The officer said that the spent shell was turned over to Dr. Charles White, a State toxicologist.
Humphrey recalled that, on Saturday, October 12,1974, three days after the robbery, he went to the WPAX radio station. At that time, Arthur Lewis, along with others came out of the radio station. Humphrey acknowledged that, on that occasion, he had found more than one shotgun in the station.
During the trial, he identified State’s Exhibit No. 5 as the twenty gauge pump shotgun that he found inside the radio station. Humphrey testified that this gun had been turned over to State Toxicologist, Dr. Charles Smith.
During cross-examination, Humphrey stated that he did not see the appellant on October 12,1974, nor did he see him on the night of the robbery at Delchamps.
On further questioning, this witness stated that he saw three individuals come out of the radio station. They were Julian Davis, Reginald Reese Robinson and Arthur Lewis. According to Humphrey, three weapons were found inside the station.
Dr. Charles Wesley Smith, of the State Department of Toxicology and Criminal Investigation in Montgomery, testified that he made a comparison test on a Remington twenty gauge spent, rifle slug and a twenty gauge sawed-off shotgun, both of which had been turned over to him by Detective Humphrey. Smith stated that the comparison test on the twenty gauge shell and the twenty gauge shotgun indicated that the *1208 shell had been fired in the receiver of the shotgun to the “exclusion of all other guns of similar make and caliber.”
James H. Evans, District Attorney for Montgomery County, Alabama, testified, outside the presence of the jury, that he talked to the appellant on January 25, 1975. The district attorney stated that he had advised the appellant of his constitutional rights prior to the conversation and that he made a tape recording of the conversation with the appellant.
During the trial, transcriptions of the tape recording were read into the record. The transcriptions showed that the appellant had been made aware of his constitutional rights and indicated that he had signed a waiver of those rights. In the taped interview, the appellant admitted his participation in the Delchamps’ robbery, but denied shooting Crawford Herring. The appellant admitted that he was standing beside Herring when he was shot. According to the appellant, he had with him a .38 caliber pistol and did remove money from the register.
Further, the transcription revealed that the appellant said that Arthur Lewis carried a twenty or a twelve gauge shotgun during the robbery and that Charles Williams had a “cut-off — .22 rifle.” The appellant chose not to reveal, in his statement, who shot Crawford Herring. The appellant denied shooting the deceased. Also, the appellant stated that all of the men were involved in the planning of the robbery and that all wore “ski masks” during the robbery.
At the end of Mr. Evans’ testimony, the State rested its case, and, after overruling the defense’s motion to exclude the State’s evidence on the ground that the State had failed to make a prima facie case, the defense called its first witness, Alphonso Davis.
Davis testified that he had been charged with the murder of Crawford Herring. The witness stated that he knew Arthur Lewis with whom he had become acquainted through a karate class. Davis testified that the robbery at Delchamps occurred about a week or a week and a half after he attended his first karate lesson. Also, Davis said he had no knowledge that the robbery had been planned. He stated, “It was something to my knowledge that just come about right prior to the time in which it happened.”
Davis testified that Arthur Lewis had directed him to buy the ski masks and that, later, Lewis told them that the masks were to be used in the robbery of the Delchamps store. The witness recalled that Lewis told the men that he had been sent by God and that he was God.
During cross-examination, Davis stated that, after the robbery, he heard Arthur Lewis “speak about” the killing of Crawford Herring. Further, he admitted that “there were words exchanged” by all of them concerning the killing and that the appellant was present at the time. Charles Williams, witness for the defense, was not willing to testify in the case against the appellant. Williams testified that he was in custody at the city jail for the Delchamps robbery and that he had previously testified for the district attorney in the trials of Arthur Lewis and Julian Davis. The defense attorney, at that time, moved for production of the transcripts of Williams’ testimony given at the previous trials, but the motion was denied by the court.
Amos Williams, the appellant, testified that sometime after 1973, he met Arthur Lewis, then later met Reginald Robinson, Julian Davis, Charles Williams and Alphonso Davis. The appellant acknowledged that Lewis had claimed to be “Allah.” Williams stated he did not know what to believe and said, “I was mixed up because knowing the power which he had he could have been anybody.” According to Williams, he and the others were students of Arthur Lewis.
Williams testified that he was arrested in Kentucky on charges arising from the robbery of Delchamps. He was taken before a judge in Kentucky and, when asked if he wanted a lawyer, the appellant answered affirmatively. According to appellant, he did not receive an attorney, was later trans *1209 ferred to Montgomery, and remained in the county jail until he talked with the district attorney.
Williams testified that he had participated in the Delchamps’ robbery and that he had a gun at the time. Further, he acknowledged that he never intended to shoot anyone and that he had not been given any instructions to shoot anyone.
Immediately after the robbery, the men returned to Lewis’ apartment. The appellant carried the money in a sack and placed it on a table. He stated that he had asked “Teacher” Lewis to give him some of the money so that he could buy food for children. According to Williams, he was given ten dollars to purchase food. The appellant denied that he got any money for his personal use and added that the money taken during the robbery was to be used for the poor.
During cross-examination, Williams admitted that he was involved in the robbery and that he “got the money out” of the store. Further, he stated that he went to Kentucky because the police were after him. The appellant denied shooting Herring and denied having any knowledge that Herring was to be killed. Williams also denied that he “stuck” his gun in Herring’s back.
Amos L. Williams, Sr., father of the appellant, testified that, his son had been “sickly” most of his young life and had not appeared to be a normal baby. According to the witness, the appellant had been hit on the head with a baseball bat during an early period in his life and had experienced hallucinations. Williams testified that his son, in his opinion, was abnormal, and on October 9, 1974, at the time of the robbery, his son was “insane.”
The testimony of Alvetta Bell Williams, mother of the appellant, paralleled that of her husband, Amos L. Williams, Sr. She stated that, in her judgment, on October 9, 1974, at the time of the robbery, her son was not normal.
Dr. Stickney, a psychiatrist and clinical director at Montgomery Mental Health Center, testified that he had examined and re-evaluated the mental condition of the appellant at the request of the appellant’s attorney. This evaluation occurred during an interview with the appellant which lasted for approximately forty-five minutes to an hour. Based on observation of the appellant, the history which the Dr. obtained and a discussion with appellant’s parents, Dr. Stickney’s diagnosis was that the appellant suffered from a condition known as “hysterical personality.” According to Dr. Stickney, this condition is characterized as a mental disease in the diagnostic Manual of the American Psychiatric Association. The witness doubted that the appellant appreciated the gravity of his offense at the time he was arrested. Dr. Stickney had “strong doubts” about appellant’s capacity, at the time of the robbery, to form the intent to take a human life. Further, he said that, in his opinion, the appellant did not have the capacity to premeditate or deliberate a criminal offense.
During cross-examination, Dr. Stickney admitted that his clinical impressions were based on a forty-five minute interview with the appellant. However, on further examination, the doctor said that the length of the interview was “just about standard form for diagnostic interview.”
At the end of Dr. Stickney’s testimony, the defense rested, and the case was submitted to the jury.
I
The appellant contends that the State failed to prove that part of the indictment which charged Amos Williams with the killing of Crawford Herring by shooting him with a sawed-off shotgun. The appellant argues that malice aforethought was not proved.
Title 14, § 14, Code of Alabama 1940, Recomp.1958, provides, in pertinent part:
“[All] persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid or abet in its commission, though not present, must hereafter be indicted, tried, and punished as principals, . . .”
*1210 The law is well settled in this State that, although an appellant may not have fired the fatal shot, such fact does not bar his conviction because one who aids another in the commission of a criminal offense is as equally responsible as the actual doer of the act. King v. State, 49 Ala.App. 111, 269 So.2d 130; Brown v. State, 41 Ala.App. 641, 148 So.2d 255. See also, Miles v. State, Ala.Cr.App., 343 So.2d 801; Roberson v. State, 218 Ala. 442, 118 So. 654. Title 14, § 314, Code of Alabama 1940, Recomp.1958, provides, in pertinent part:
“Every homicide . . committed in the perpetration of, or the attempt to perpetrate, any arson, rape, robbery . is murder in the first degree.”
The fact that the specific allegation concerning the shooting with a shotgun was not shown was not error under the rationale of Brown v. State, supra, and King v. State, supra. That the appellant was present, willing and able to aid in the commission of the Delchamps store robbery was sufficient for a conviction of murder in the first degree, even though he did not fire the fatal shot.
Because there was evidence showing that a robbery had been committed and that a homicide had resulted from that robbery, then the homicide was murder in the first degree and the criminal intent which is involved in the commission of the robbery itself “supplies the place of malice aforethought.” Hardley v. State, 202 Ala. 24, 79 So. 362.
II
The appellant maintains that the shotgun identified by Detective Humphrey as the one taken from the radio station was erroneously admitted into evidence because the gun was in “no way linked directly to the defendant.” Appellant argues that there was no eyewitness to testify that the shotgun appeared to be the shotgun used at the time of the robbery.
“As a general rule, articles, including those found at the scene of the crime, which are properly identified and which tend to show the commission of the crime or the manner in which it was committed, or to elucidate some matter in issue, are admissible in evidence for inspection and observation by the jury.” Lackey v. State, 41 Ala.App. 46, 123 So.2d 186.
In Jackson v. State, Ala.Cr.App., 337 So.2d 130, this court, in addressing a similar question, said:
“[T]he jurors were, of course, entitled to give this evidence such weight as they deemed sufficient under all the facts duly presented to them in this case. We think the jury could deduce that the appellant was connected to the weapon used in the commission of the crime.”
See also, Kyzer v. State, 250 Ala. 279, 33 So.2d 885; Means v. State, 51 Ala.App. 8, 282 So.2d 356.
In the present case, all the witnesses present during the shooting at the Del-champs store stated that they heard a loud noise like the firing of a shotgun and that the noise occurred immediately before the robbers ran from the store. Some of the witnesses stated that, immediately after the robbers left, Crawford Herring was seen lying in a puddle of blood with a hole in his neck.
Further, the witnesses, testified that the two men who were at the front of the store during the robbery were armed with a pistol and a shotgun. Also, the appellant stated that he was armed with a .38 revolver, while his companion, Arthur Lewis, was armed with a shotgun.
Detective Humphrey stated that, during his investigation of the robbery he found several twenty gauge shotgun shells. One of the shells was spent. These shells were turned over to Dr. Charles Smith of the State Toxicology Department.
Dr. Charles Smith testified that he ran a comparison test on the spent twenty gauge shell and the twenty gauge pump shotgun and it was his conclusion that the spent twenty gauge shotgun shell was, in fact, fired from the twenty gauge shotgun found in the radio station. In our judgment, the shotgun was properly identified and was properly admitted into evidence for *1211 the jury’s consideration as to whether the shotgun found at the station was in fact the same one used during the robbery and the shooting at the store. The jurors were entitled to give this item of evidence whatever weight they deemed sufficient under the facts presented in the case. Further, we believe the jury could determine that the appellant was “linked” to this weapon and its use during the commission of the robbery.
Ill
It is asserted that the transcript of the recorded confession of the appellant should not have been admitted into evidence. The appellant argues that the State failed to prove the appellant knowingly, intelligently, and voluntarily made the statement. Further, appellant contends that he was not represented by counsel at the time of the statement and was not capable of personally waiving his right to counsel.
The appellant bases his argument on a United States Supreme Court decision, Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199,12 L.Ed.2d 246. The appellant’s argument seems to be that Massiah prohibits any confession obtained post-indictment, in absence of counsel, notwithstanding the fact that the confession was voluntarily made after a knowledgeable waiver of the constitutional rights outlined in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The Supreme Court of the United States, in Massiah v. United States, supra, was confronted with the admissibility of an incriminating statement made by the defendant to a confederate who had been previously wired with a transmitter. The conversation between the defendant and the co-defendant-confederate was monitored by a police officer with a radio receiver. In Massiah, the court was concerned with the admission of incriminating words which had been deliberately elicited from Massiah after he had been indicted and while he was unattended by counsel.
We recognize that in Massiah v. United States, supra, certain special circumstances existed which tainted the extrajudicial statements made voluntarily, after indictment and without counsel. In our judgment, our reading of Massiah v. United States, supra, requires that there be some additional circumstance other than mere absence of counsel before a defendant’s post-indictment confession is rendered inadmissible. United States v. DeLoy, 421 F.2d 900 (5th Cir.); Coughlan v. United States, 391 F.2d 371 (9th Cir.); Arrington v. Maxwell, 409 F.2d 849 (6th Cir.); United States v. Garcia, 377 F.2d 321 (2nd Cir.); United States v. Gardner, 347 F.2d 405 (7th Cir.); United States v. Accardi, 342 F.2d 697 (2nd Cir.); Wilson v. United States, 398 F.2d 331 (5th Cir.). In the present case, there is no special circumstance which would render appellant’s statement inadmissible.
The testimony by the district attorney positively showed that the appellant was properly advised of all his rights immediately before he made a statement. This statement was recorded and transcribed, and there can be no doubt that the appellant understood these rights and intelligently waived them. He signed a waiver of those rights which was witnessed by one of the Montgomery officers. The trial court, prior to the admission of the recorded confession, which was later transcribed, conducted a hearing outside the presence of the jury and determined that the defendant was properly advised of his rights and that he understood those rights prior to any waiver.
The record is clear that the confession was freely and voluntarily made after the appellant had been informed of his rights and that he effectively waived his constitutional rights as per Miranda. Under these circumstances, we believe that Williams’ confession to the district attorney was properly admitted into evidence.
IV
Regarding appellant’s contention that his motion for a judgment of acquittal was erroneously denied, we find no ruling by the trial court on the motion. Under these circumstances, this point is not before this court for review. Wetzel v. State, 32 Ala. App. 32, 21 So.2d 557.
*1212 V
The appellant complains that he should have been provided additional counsel and a special venire because this was a capital case. Cases involving first degree murder at the time of this offense were not considered capital felonies. Avery v. State, Ala.Cr.App., 363 So.2d 1036; Fisher v. State, 57 Ala.App. 310, 328 So.2d 311; Usrey v. State, 54 Ala.App. 448, 309 So.2d 485. Also, under Alabama law, there is no provision entitling a defendant to more than one attorney in any felony.
Therefore, after carefully examining the record and finding no error, it is our opinion that the judgment of the Montgomery Circuit Court should be affirmed.
AFFIRMED.
All the Judges concur.