James W. Johnston was charged with and convicted of capital murder of Miss Mildred Hart, a 67-year-old resident of Andalusia, Alabama. His case was appealed to this court, which reversed and remanded. Johnston v. State, 455 So.2d 152
(Ala.Cr.App.), cert. denied, 455 So.2d 152 (1984). He was again tried, but this time convicted of murder rather than capital murder. He was sentenced to life imprisonment in the penitentiary; from this second conviction and sentence he prosecutes this appeal.
One of the issues in the case is sufficiency of the evidence. The statement of facts presented by the attorney general provides a summary of the state's evidence, and we set it out here:
 "On May 16, 1982, Mrs. Mary Braxton telephoned her lifelong friend, Miss Mildred Hart, a little after 7:00 a.m. as it was their usual custom to call each other every morning to see that everything was all right. After each of three calls received no answer, Mrs. Braxton called Mrs. Franklin, who met her at Miss Hart's residence. They went through the garage, where they saw a bag of groceries in Miss Hart's car. Then the two ladies proceeded to the back door and called for Miss Hart. When they received no answer, they opened the unlocked door and saw papers, cloth napkins, and rubbish littering the kitchen floor. They also observed a broken window, glass on the floor, and little shutters torn from the window and broken. The two ladies then went to a neighbor's house and called the police.
 "Mrs. Braxton stated she knew the Appellant and had seen him passing Miss Hart's house. Miss Hart had in fact pointed the appellant out to Mrs. Braxton.
 "Mrs. Levonia Fugua testified that Miss Hart checked out at her cash register at the Winn-Dixie at 10:57 a.m. on Saturday, May 15, 1982.
 "John Earl Duggan, another lifelong friend of Miss Hart's, testified he had had a conversation with Miss Hart concerning the defendant. As a result of his conversation with Miss Hart, Mr. Duggan gave her a .38 Smith and Wesson pistol. He has seen the defendant in the street in front of Miss Hart's house.
 "When Officer Spivey of the Andalusia Police Department arrived, Mrs. Braxton and Mrs. Franklin related their discovery to him. They entered the house and Officer Spivey found the body of Miss Hart in the bath tub, which was half full of water. The house was then secured.
 "Charles Brooks, Department of Forensic Sciences, arrived at the scene at 10:00 a.m. In the east bedroom he observed that papers and other materials *Page 846 
had been pulled out of drawers. On the telephone bench, Mr. Brooks recovered a striped blouse, green slacks, and a bra. A pair of panties and a girdle, both of which had been cut with some instrument from each leg hole to the waist band, were beside the bed on the floor. Here, a checkered apron was also recovered. Mr. Brooks further noted that two pieces of white electrical cord were found attached to the bedposts — one to the bottom northwest post and the other to the bottom northeast post. Three pieces of telephone cord were on the floor by the bed and on the bed. On the kitchen table he found a short, reddish brown hair which he determined to be a mustache or beard hair from a Caucasian. This hair was subsequently compared to known mustache hairs of the appellant and they had the same physical and microscopic characteristics. The body was lying face down in the tub in three or four inches of water. A white bath towel was wrapped partially around Miss Hart's neck and to each wrist was attached a piece of electrical cord similar to that found on the bedposts. What appeared to be blood was coming from the vaginal area.
 "The inside of Miss Hart's house was `a mess.' It appeared that someone had eaten some ice cream, as there was a carton on the table with a spoon in it. A bottle of Coke was also partially gone.
 "Officer Garrett of the Andalusia Police Department identified the body as that of Miss Hart and then processed each room for latent fingerprints. From the several hundred specific areas that Officer Garrett dusted, he obtained nineteen valuable prints. Three of those nineteen prints were identified as the victim's palm prints; none were identified as belonging to Appellant. At trial, Officer Garrett testified that when he took appellant's fingerprints for comparison, he found appellant's fingers to be extremely dry and leatherlike; he explained that these conditions would prevent appellant from leaving good latent prints.
 "During the police investigation conducted within the victim's home, Appellant was seen several times outside Miss Hart's residence. Investigator Treadaway saw appellant in front of Miss Hart's home on at least eight occasions. Upon the investigator's inquiry, Appellant stated that he had not seen anybody messing around the house nor any strange people in the neighborhood. After the investigator asked him to leave the area because the police were still conducting their investigation, appellant left.
 "An autopsy was performed on Miss Hart's body on this same day, May 16, by Dr. Thomas Gilchrist, a forensic pathologist with the Montgomery Laboratory of the Alabama Department of Forensic Science. During the autopsy, Dr. Gilchrist noted contusions or bruises on the forehead, the scalp, the upper arms, over the left breast, on the left shoulder and back area, on a thigh, and on a knee. Small lacerations caused by blunt force were found on the forehead and behind the right ear. Injuries to the genitalia included small lacerations to the entrance to the vagina and to the anus. Dr. Gilchrist deemed these latter injuries to be consistent with rape. A vaginal smear revealed the presence of sperm. Dr. Gilchrist opined that the cause of death was ligature strangulation: the blood supply to the brain was cut off by a large, soft ligature wrapped completely around the victim's neck. He approximated the time of death to be noon on May 15, give or take four hours either way.
 "Sometime later in the day, Investigator Treadaway went to see Appellant at his residence for the purpose of collecting hair samples. When the investigator and appellant had come out the front door and were about to get in the police vehicle, appellant said, `I didn't rape the woman, I didn't kill her, I didn't drag her to another room.' After the two men got in the car and as the investigator was about to drive across the railroad tracks on the way to the police station, appellant stated, `I didn't rape the woman and *Page 847 
I didn't kill her.' While they were in the back of the station where fingerprints and photographs are taken, appellant declared, `I didn't rape the woman, didn't kill her, and didn't drag her to the closet.' All three of appellant's statements were freely and voluntarily given; no statement resulted from questioning.
 "Appellant was arrested on May 17 by Officer Newton who at the time of the arrest advised appellant that
 he was under arrest for the murder of Mildred Hart and, also, advised appellant of his Miranda rights. Appellant then consented to giving nasal, blood, and pubic hair samples and he was transported to community hospital by Officers Garrett and Anderson. About an hour after his arrest — sometime between 5:30 p.m. and 6:30 p.m. — appellant made a statement in front of Investigator Tucker, Agent Davis, and Officers Anderson and Garrett. The statement was not the result of any questioning or interrogation nor was it the product of any reward, hope of reward, or threat; appellant appeared to know what he was saying. When Investigator Tucker walked into the room of the hospital where appellant was, appellant asked who he was, to which the investigator replied that he was a state investigator. Appellant then asked him if he was the officer who arrested him and he replied negatively, explaining that the Andalusia Police Department had arrested him. Appellant then made the statement to the effect:
 `I'm your man. It took you three days to get me, but you will never convict me, because they said I'm crazy.'
 "Appellant made yet another voluntary statement concerning Miss Hart's death around December 13, to Mrs. Brenda Sweatt, the matron of the jail. Such statement was not the result of questioning, promise of reward or hope of reward, or threat. Mrs. Sweatt was passing out medication when appellant asked her if he could take a shower. She replied that he could not because she was about to get off work. Appellant then said that he would not do her like he did Miss Hart."
 I
Appellant first contends that his utterance while in custody on May 17, 1982 was inadmissible because it was the fruit of an illegal arrest. This was the statement made in the presence of three officers at the hospital and quoted above:
 "I'm your man. It took you three days to get me but you will never convict me, because they said I'm crazy."
This contention was made at the first trial and on the first appeal of this case, and the determination and ruling were made at that time that this utterance was admissible as a voluntary statement. Consequently, this issue is res judicata as to us now.
 II
Appellant next contends that the court erred in admitting his three pre-arrest statements because they were denials instead of admissions. The appellant made comments to Officer Treadaway before he was arrested as follows:
(1)
 "I didn't rape the woman, I didn't kill her, I didn't drag her to another room."
(2)
"I didn't rape the woman, and I didn't kill her."
(3)
 "I didn't rape the woman, didn't kill her, and didn't drag her to the closet."
The admissibility of these statements was treated at length in the first appeal of this case. The court there ruled that all three statements were spontaneous, voluntary, and not prompted by interrogation. Accordingly, this issue is a matter already decided, res judicata. *Page 848 
 III
Appellant next contends on this appeal that the court erred in refusing to allow defense witnesses to give their opinion as to whether the defendant was mentally ill. We have closely examined the facts in this case regarding this issue. The principal defense witness called to suggest mental illness was one Cathy Wyatt, the director of the Montezuma Center, a rehabilitation center. She testified to being a mental health counselor with a bachelor's and master's degree in rehabilitation counselling. She testified that she had frequent contact with the appellant for three and one-half years while he was a client of hers at the Montezuma Center. She was permitted to testify that she had formed the opinion during the period of her treatment of the appellant that he was mentally ill. There was no adverse ruling as to her giving her opinion.
The next witness was Cupidean Adkinson, a mental health worker at Montezuma Center. She was not allowed to state her opinion that appellant was mentally ill. However, she was allowed to testify as to his talking a lot, talking "off-topic", and frequently referring to people in the political arena. She also stated, however, that in her opinion the appellant knew the difference between right and wrong.
The next witnesses called on behalf of the appellant were his former wife and his four children.
The evidence was that the appellant James W. Johnston had spent 18 years in Bryce Hospital from 1960 to 1978. After he was incarcerated about 7 years, his wife divorced him and subsequently remarried. She had married him in 1950 and they had several children. She testified that based upon what she saw, the appellant was mentally ill. However, she stopped visiting him in 1967, was not around him, and did not know much about him or his condition from 1967 until the time she testified in 1985.
Appellant's four children testified as witnesses in support of their father's insanity. His son Frank said that he saw the appellant when he would come home on a visit once every couple of years or so and saw him once in 3Mobile for an overnight visit when his father stayed at a motel there. His son Terry said he remembered visiting his father a couple of times when he was under 10 years of age and that his father came home "maybe once" for a short time. He saw his father for about 30 minutes when his father came to Mobile and stayed in a motel. A third son, William, testified that his father had been in a mental institution for as long as he could remember. He said his father came home for short visits and he visited him some while he was in the hospital. This witness testified he had last seen his father 21 years before the occasion of his testifying as to his mental condition. Appellant's daughter Cynthia testified that her father had been in a mental hospital for as far back as she could remember, that she visited him there and that he came home for visits. That once when he was home he went for walks at night and sometimes took her with him on walks. She testified that she had never visited her father in Andalusia.
In light of the lack of opportunity of these people to observe the appellant, the court did not err in refusing to allow them to give their opinions as to whether he was mentally ill. Carroll v. State, 370 So.2d 749 (Ala.Cr.App.), cert. denied, 370 So.2d 761 (Ala. 1979), sets out very well the law as to lay opinions of mental conditions, as follows:
 "A nonexpert witness cannot testify to the mental condition of a person until it has been shown that he has an intimate acquaintance with such person and that his association with him is of such a duration as to justify the forming of an opinion. Langston v. State, 16 Ala. App. 123, 75 So. 715 (1917).
 "`A lay witness may give his opinion that another was insane or afflicted with an analogous mental defectiveness if, but only if, the witness has first testified: (1) to facts showing that he had an adequate opportunity to observe such other's conduct in general and (2) to his personal observation of *Page 849 
specific irrational conduct of such other.
 "`It should be emphasized that a lay witness may not testify that it is his opinion that another was insane, no matter how extensive and adequate the witness' opportunity to observe such other's conduct, unless the witness has first testified to his personal knowledge of specific irrational conduct of such other.'"
It must be remembered that the issue in this matter is the applicability of § 13A-3-1 (a), Code of Alabama 1975, which provides:
 "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."
Our case of Brackin v. State, 417 So.2d 602 (Ala.Cr.App. 1982), makes it clear that legal insanity does not embrace every kind of mental disease and disorder that renders a person not responsible for his acts: "`Emotional insanity or moral obliquity will not sustain a plea of insanity.'"; "`Unusual or "weird" behavior alone cannot be equated with mental incompetency or insanity.'" Brackin also points out that the legislature in § 13A-3-1 (b) deliberately and positively excluded antisocial conduct, standing alone, from the definition of insanity.
Again in Young v. State, 428 So.2d 155 at 160 (Ala.Cr.App. 1982), the court stated that "evidence of mental or emotional impairment or disability not amounting to legal insanity does not furnish sufficient evidence to warrant the submission of the insanity issue to the jury." Young held that where the evidence offered to substantiate a plea of insanity is insufficient as a matter of law as determined by the court, the court may instruct the jury accordingly and remove the insanity issue from the jury's consideration.
The court did not err in ruling on the admissibility of this evidence.
 IV
Appellant next contends that the court erred in denying appellant's challenges for cause as to three jurors. Section12-16-150, Code of Alabama 1975, provides that a juror may be challenged for cause if he has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict.Fuller v. State, 269 Ala. 312, 113 So.2d 153 (1959), cert. denied, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960), held:
 "[T]he criterion for deciding whether a juror is disqualified by reason of a fixed opinion depends upon the extent, the degree, or the deepness of his impression. If the deepness of the impressions is such as to close the mind of the juror, he should be disqualified. A fixed opinion which would bias the verdict is a conviction or prejudgment, a strong or deep impression which closes the mind of the juror and combats the testimony and resists its force." 296 Ala. at 323, 113 So.2d at 161.
A mere expression of opinion based on rumor does not render a juror incompetent to try a case if he does not have a "fixed opinion which would bias his verdict." Blevins v. State,20 Ala. App. 229, 101 So. 478 (1924).
A juror, even though having previously expressed an opinion regarding a defendant's guilt, is not disqualified if he states unqualifiedly that as a juror he can find a true verdict on the evidence alone. Willingham v. State, 262 Ala. 550, 80 So.2d 280
(1955).
The jurors in this case were asked by the court if they had a fixed opinion as to guilt or innocence. One juror answered that he did, and that juror was promptly dismissed. The jurors were asked if any could not set aside any opinion they had about the case and be able to judge the case solely without reservation based on the evidence introduced at trial. No juror indicated that he or she would be unable to conform to this standard. *Page 850 
The three jurors in question said that they would not want someone to sit as a juror on their case who knew as much about it as they knew about the appellant's case. It is a nice idea to think that jury trials, especially sensational criminal jury trials, might be tried in a vacuum or a sterile atmosphere. Such an atmosphere, however, seldom exists in the "global village" with the advanced techniques of news gathering and dissemination now in effect. There are many cases that everyone has heard of. It is not reasonable to expect to select a jury of competent, aware people who have never heard anything at all about a sensational case. These jurors passed the test of not having a fixed opinion which would bias their verdict and, therefore, they were suitable jurors. Their remarks certainly did not disqualify them or secure them an exemption from jury service.
 V
Appellant finally contends that the evidence was insufficient to support a jury verdict of guilty of murder. This is a matter which was much inquired into in an earlier decision of this court. We here quote at length, and with full approval, fromJohnson v. State, 378 So.2d 1164, 1169-70 (Ala.Crim.App. 1979):
 "In reviewing the sufficiency of the evidence the appellate courts of this State are bound by several well settled rules. It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt and to a moral certainty. Instead, the function of this Court is to determine whether there is legal evidence from which a jury could by fair inference find the defendant guilty. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.), cert. denied, 368 So.2d 877 (Ala. 1979); Scruggs v. State, 359 So.2d 836, 842 (Ala.Cr.App.), cert. denied, 359 So.2d 843 (Ala. 1978).
 "In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State and accord the State all legitimate inferences therefrom. Ellis v. State, 338 So.2d 428 (Ala.Cr.App. 1976); Edson v. State, 53 Ala. App. 460, 301 So.2d 226 (1974). The evidence must be considered in the light most favorable to the prosecution. Colston v. State, 57 Ala. App. 4, 325 So.2d 520 [1975], cert. denied, 295 Ala. 398, 325 So.2d 531 (1975 [1976]).
 "Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this Court has no right to disturb the verdict. Bell v. State, 339 So.2d 96 (Ala.Cr.App. 1976). A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust. Bridges v. State, 284 Ala. 412, 225 So.2d 821 (1969); Morton v. State, 338 So.2d 423
(Ala.Cr.App. 1976). There is a presumption in favor of the correctness of a jury's verdict, and when the trial judge declines to grant a new trial that verdict is strengthened on appeal. Tolliver v. State, 50 Ala. App. 654, 658, 282 So.2d 92 (1973).
". . . .
 "In a prosecution for murder, the corpus delicti consists of two elements: (1) Death of the victim named in the indictment and (2) that death was caused by the criminal agency of another. McDonald v. State, 56 Ala. App. 147, 149, 320 So.2d 80 (1975). To prove the corpus delicti it is not necessary to prove that the victim's death was occasioned by the criminal agency of the defendant. James v. State, 339 So.2d 1047, 1050 (Ala.Cr.App.), cert. denied, 339 So.2d 1052 (Ala. 1976). Once there is independent evidence of the corpus delicti, a confession is not required to be corroborated. King v. State, 49 Ala. App. 111, 269 So.2d 130 (1972). The confession of accused, alone, may be sufficient to show his connection with the homicide if the corpus delicti is established by other evidence. Arnold v. State, 57 Ala. App. 172, *Page 851 326 So.2d 700 (1976); Smith v. State, 25 Ala. App. 297, 145 So. 504 (1933); Minton v. State, 20 Ala. App. 176, 101 So. 169 (1924); Rowe v. State, 243 Ala. 618, 11 So.2d 749 (1943)."
There is no question of the proof of the corpus delicti in this case. The proof of the criminal agency of the appellant specifically was also sufficiently made out. Viewing the evidence in the light most favorable to the state, as must be done in considering this issue in appealed criminal cases, we find that there was sufficient evidence from which the jury might have been convinced beyond a reasonable doubt of the guilt of the appellant.
This case is due to be affirmed.
AFFIRMED.
All the Judges concur.